ESTATE OF MAURICE GUSTAVE HECKSCHER, LEO R. BEST, ADMINISTRATOR, C.T.A., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6896-72.   Filed January 29, 1975.

*Robert O. Rogers,* for the petitioner.
*Richard Baron,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in the amount of $49,152.41 in petitioner's estate tax and an addition to tax in the amount of $12,288.10 under section 6651(a), I.R.C. 1954. Following certain concessions by the parties, the issues remaining for decision are: (1) The value at the date of decedent's death of 2,500 shares of stock of Anahma Realty Corp. which were properly included in decedent's gross estate; and (2) whether attorney's fees incurred by decedent's wife in defending her claim to trust property appointed to her under decedent's will are deductible by the estate as administrative expenses pursuant to section 2053, I.R.C. 1954.

FINDINGS OF FACT

Certain facts have been stipulated and are so found.

Petitioner is the Estate of Maurice Gustave Heckscher, Leo R. Best, administrator, c.t.a., with his principal place of residence at Palm Beach, Fla. An estate tax return for the estate was filed with the district director, Internal Revenue Service, Jacksonville, Fla., on June 12, 1969. The date of death of the decedent was June 11, 1967.

Under an indenture dated May 13, 1929, between August Heckscher, father of decedent, and Farmers Loan & Trust Co., a corporation organized under the laws of the State of New York, the decedent's father entered into a trust agreement whereby 2,500 shares of Anahma Realty Corp. (hereinafter Anahma) stock were held in trust for the decedent with a testamentary power of appointment. By his last will and testament the decedent appointed said property to his surviving spouse.

On the estate tax return of decedent the value of the 2,500 shares of Anahma stock was reported at $50 per share or an aggregate of $125,000.

Anahma is a holding company, incorporated under the laws of the State of New York on May 29, 1917, which owns listed and unlisted stocks, bonds, and a wholly owned subsidiary Hernasco, Inc. (hereinafter Hernasco). As of the date of death there were 108,675 shares outstanding of Anahma of which approximately 55 percent were controlled by the Heckscher Foundation for Children, a charitable organization founded by the decedent's father.

Since 1952, Anahma's principal business has been the holding of investments and through its subsidiary, Hernasco, undeveloped land in Florida.

Hernasco, at the time of decedent's death, owned 28,604 acres of undeveloped land in Hernando and Pasco Counties in the State of Florida, which land had a fair market value of $300 per acre at that time or an aggregate value of $8,581,200. The parties agreed that for the purposes of this proceeding, the commissions and expenses that would be incurred in selling this land would amount to 10 percent of the gross sales price, or $858,120. This land had a cost basis to Hernasco of about $245,000. The remaining assets of Hernasco had a value at date of death of $3,556,841, consisting primarily of preferred stocks and a mortgage receivable.

On June 11, 1967, the fair market value of Anahma's holdings of stocks and bonds, excluding Hernasco but including Madison Avenue Offices, Inc., another subsidiary, was $9,600,000. The net asset value of Hernasco as of the date of decedent's death was $11,278,921. Accordingly, the total net asset value of Anahma as of June 11, 1967, was $21,019,843.[1]

For each of the years 1957 through 1973 Anahma was a personal holding company as defined by section 542, I.R.C. 1954.

During the period that Anahma has been a personal holding company it has followed the practice of distributing as a dividend all of its personal holding company income as defined by section 543, I.R.C. 1954. During the years it was a personal holding company, Anahma did not make any capital gains distributions.

The following are the dividends paid per share by Anahma during the years 1962 through 1973:

| | | | |
|---|---|---|---|
| 1962 | $2.37½ | 1968 | 3.65 |
| 1963 | 2.43 | 1969 | 3.77 |
| 1964 | 2.42 | 1970 | 4.85 |
| 1965 | 2.64 | 1971 | 5.50 |
| 1966 | 2.90 | 1972 | 5.00 |
| 1967 | 3.55 | 1973 | 5.00 |

The stipulated fair market value of the unimproved land held by Hernasco represented approximately 40 percent of Anahma's total net assets.

---

[1] These figures were stipulated. We do not know the reason for the discrepancy between the total value figure and the sum of the two preceding figures.

Anahma's five largest single blocks of freely traded common stocks, in terms of market value, were: Texaco, Inc., Eastman Kodak Co., Houston Natural Gas Corp., General Telephone & Electronics Corp., and Merck & Co. The market value of these common stocks as of the valuation date was approximately $2,214,000, representing approximately 25 percent of Anahma's common stockholdings or 10 percent of Anahma's total assets. The average yield of these common stocks was less than $2\frac{1}{2}$ percent. The average yield of Anahma's common stocks was 2.1 percent.

The following reflects Anahma's pretax earnings from dividends and interest for the years 1965-67:

| Year | Pretax earnings |
|------|-----------------|
| 1965 | $358,935 |
| 1966 | 383,031 |
| 1967 | 471,266 |

Based on Hernasco's financial statements for the years 1965 through 1967, the following figures reflect Hernasco's losses and pretax net profits (exclusive of land sale profits in 1965 ($41,695) and 1966 ($3,810,687.21)) for those years:

| Year | Pretax net profit (losses) |
|------|-----------------------------|
| 1965 | ($9,406.27) |
| 1966 | 2,431.78 |
| 1967 | 92,775.87 |

In about 1966, it became apparent to the directors of Anahma and Hernasco that, because of rising real estate taxes, it would be advisable to dispose of some of Hernasco's unimproved and unproductive land. In 1966, Hernasco sold 18,837 acres of its undeveloped land in Hernando County, Fla., to Deltona Corp. at a price of $214 per acre and reported a profit on the sale of $3,810,687. It took a purchase-money mortgage on the land for most of the purchase price which bore interest at the rate of 7 percent per annum.

Hernasco paid no dividends for the years 1963, 1964, and 1965. It paid dividends of $10,000 for 1966 and $70,000 for 1967 to its sole stockholder, Anahma.

On October 20, 1933, and incident to a divorce, decedent entered into a marital property settlement agreement with his prior wife, Luella Gear Heckscher (hereinafter Luella). As a part of such agreement, decedent agreed to exercise his power of appointment over the trust estate in favor of Luella to the extent

of the unpaid balance of $100,000 obligation he assumed therein. Following decedent's death, the Bank of New York, as successor trustee of the trust of Gustave M. Heckscher, petitioned the Supreme Court of the State of New York for instructions as to the delivery of $96,000, the unpaid balance of the $100,000, because decedent in his will had appointed the entire trust property to his surviving spouse, who at the time of his death, was Ilene Kari-Davies Heckscher (hereinafter Ilene).

Luella and Ilene became parties to this action. The New York Supreme Court held that Ilene was the proper beneficiary of the trust corpus. In connection with this judicial determination, Ilene directly paid legal fees in the amount of $14,170.69.

The parties have stipulated that $15,000 of $63,654.22, determined by respondent as includable in the decedent's estate as gifts in contemplation of death, were actually gifts in contemplation of death and are includable.

Petitioner also concedes that the estate is not entitled to a claimed debt deduction of $26,003, disallowed by respondent in the statutory notice.

Petitioner concedes on brief that the power of appointment exercised by decedent in his will was a general power of appointment and the value of the appointed property (2,500 shares of Anahma stock) is includable in decedent's gross estate.[2]

The parties also stipulated that decedent's estate is liable for an addition to tax under section 6651(a) in the amount equal to $12\frac{1}{2}$ percent of any deficiency that may be due.

Finally, the parties stipulated that as part of the computation under Rule 155 that will be necessary in connection with this proceeding, there shall be allowed as a deduction such professional fees and costs incurred in connection with decedent's estate and prosecution of this action which at that time are reasonable and have or will be paid, and such "executive [sic] commissions," not to exceed the amount of $1,450, that will or have been paid with regard to the decedent's estate.

### ULTIMATE FINDING OF FACT

The fair market value of 2,500 shares of Anahma stock at the date of decedent's death was $250,000 ($100 per share).

---

[2] While petitioner reported the 2,500 shares of Anahma stock as an asset of the estate on its estate tax return, in its petition to this Court it claimed this was error because decedent did not have a general power of appointment with respect thereto.

OPINION

*First Issue*

The first issue to be resolved is the fair market value at the date of decedent's death of 2,500 shares of Anahma stock contained in the corpus of a trust over which decedent had a general power of appointment which he exercised by his will.

Section 2001, I.R.C. 1954, imposes an (estate) tax on the transfer of the taxable estate of a decedent. Section 2051 provides that for purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the exemption and deductions provided for in part IV. Section 2031 provides that the value of the gross estate shall be determined by including, to the extent provided in part III, the value at the time of decedent's death of all property wherever situated. Under section 2033 the value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death. And finally section 2041(a)(2) provides that the value of the gross estate shall include the value of all property to the extent of any property with respect to which the decedent has at the time of his death a general power of appointment created after October 21, 1942.

Petitioner concedes that decedent had a general power of appointment over the 2,500 shares of stock of Anahma which represented the corpus of the trust created for his benefit by his father, and that the value of that stock is includable in decedent's gross estate. But petitioner and respondent disagree as to the value of the stock at the time of decedent's death, which occurred on June 11, 1967.

The accepted definition of fair market value is contained in section 20.2031-1(b), Estate Tax Regs., which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."

If a corporate stock is bought and sold on the open market the valuation task is relatively simple. If the stock is not traded on the open market the task becomes more difficult but if it is stock of a corporation engaged in a business similar to the business engaged in by others the task is not too difficult. See sec. 2031(b), I.R.C. 1954. But where, as here, the stock to be valued is in many

ways unique and there have been no recent sales of the stock the task becomes difficult indeed.

Section 20.2031-2(f), Estate Tax Regs., provides that in valuing stock for which actual sales prices and bona fide bid and asked prices are lacking, the fair market value of such stock is to be determined by taking into consideration the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. "Other relevant factors" are stated to be—

The good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * *

Very few of the "other relevant factors" mentioned in the regulation are applicable to the corporation or the stock with which we are concerned. At the time of decedent's death Anahma was a closely held investment company and had been for many years. It had no goodwill. Its management appears to have been much more concerned with growth or increment in value of its assets than with current income. The securities it held consisted primarily of blue chip common stocks, preferred stocks, and Government and industrial bonds, the average yield on the market value of which was quite low. No other corporation could be found that could be considered comparable to Anahma because it was not engaged in any industrial or commercial business, did not buy or sell or redeem its own stock, and was a personal holding company. About 55 percent of its stock was owned or controlled by a charitable foundation and the 2,500 shares of stock here involved represented only about a 2.3-percent interest in the company. One of Anahma's most valuable assets was the stock of its wholly owned subsidiary, Hernasco, which was engaged only to a very limited extent in the real estate rental business, but held a large amount of undeveloped and unproductive land in Florida which had increased a great deal in value since it had been acquired.

Thus about the only factors that can be used to estimate the value of this stock are its net worth based on the fair market value of its underlying assets, its prospective earning power, and

its dividend-paying capacity. Anahma's dividend-paying potential can be closely related to its prospective earnings because, being a personal holding company, it had been distributing as dividends all of its personal holding company income.

In addition to the stipulated facts, the evidence presented consisted of the testimony of Howard Sloan, a director and vice president of Anahma, who testified about the company's background and policies, the testimony and valuation report of petitioner's expert, Marion C. McCune (hereinafter McCune), and the testimony and valuation report of respondent's expert, John O'Farrell. We found both expert witnesses to be well qualified and we find little fault with their assumptions and computations, except their basic assumptions as to what a hypothetical "willing buyer" of this stock would be looking for in deciding what he would be willing to pay for the stock.

McCune assumed that a potential buyer would be primarily interested in a current return on his investment rather than the value of the underlying assets because the stock involved represented such a minority interest in the company that it could not force liquidation of the company and, in the past, management of the company had evidenced no inclination to either liquidate the company, invest in less conservative and higher income-producing securities, or even to distribute capital gains. He therefore attempted to predict the potential earning power of the company, and its dividend capacity, and arrived at a value for the stock upon which the anticipated dividends would represent a fair rate of return on the investment, i.e., 8 percent.

O'Farrell, on the other hand, assumed that any buyer who would invest in this type stock would be primarily interested in growth and the value of the underlying assets, rather than current income, so he arrived at the fair market value of the stock by taking the stipulated value of the underlying assets and liabilities of both Anahma and Hernasco, dividing that by the number of shares of Anahma outstanding to get the value per share, and then discounting that value by various factors to determine the fair market value of the stock.

While there is probably some built-in recognition of the asset values in McCune's income method of valuation and probably some recognition of the desire for income in O'Farrell's asset value approach, neither appraiser gave any specific recognition of the primary factor used by the other in making his computations.

As a result of these divergent approaches in determining the value of this stock, McCune placed a value of $60 a share on it while O'Farrell valued it at $112.80 per share. It seems obvious to us that unless the buyer and seller gave more recognition to both the asset values and the need for a reasonable rate of return on the investment there would be no transaction in the stock. To make a sale of this stock feasible the potential buyer would have to forego some current return on his investment in exchange for an interest in a net worth much more valuable than the price he pays for the stock, and the seller would have to be willing to part with an equity interest in the company for much less than its indicated value in return for something that would produce a greater yield on his investment. This would require head-to-head bargaining and we hesitate to make any "Solomon-like pronouncement" [3] as to where the bargain would be struck. However, fully recognizing that the valuation of property is an inexact science at best, we have arrived at a value for this stock as reflected in our ultimate finding of fact using our best efforts with the evidence at hand.

Following is a brief analysis of the valuation methods used by the two expert witnesses.

Petitioner's witness, McCune, based his valuation entirely on income or dividends actually generated or capable of being generated; he totally rejected the net asset value method as a viable approach because the shares in question constituted a small minority interest in a closely held corporation.

After determining that dividends would be the motivating factor for any potential purchaser of the Anahma stock, McCune next reviewed the dividend history of Anahma and simultaneously attempted to project the realistic dividends which the corporation would be likely to pay out in the foreseeable future. McCune first found that the dividend paid by

---

[3] See *Morris M. Messing*, 48 T.C. 502 (1967), wherein it is said:
"an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement."

We have frequently tried to impress on counsel in valuation cases such as this that the best way to arrive at a fair resolution of such issues is for them to sit down with their experts and clients to discuss price as would a buyer and seller who both recognize the need to complete a sale, and thus arrive at a settlement figure fair to both sides. The attendants at such conferences would have a greater knowledge of all the pertinent facts and more expertise available for discussion than does a judge who has only a cold record and dry briefs upon which to base his conclusions. But, alas, with little avail.

Anahma for 1966, the calendar year immediately preceding the appraisal date, was $2.90 per share. In an attempt to estimate a possible increase in dividend income, he next considered the income-producing potential of the assets of Hernasco, the wholly owned subsidiary of Anahma. McCune reasoned that the dividend could be expected to increase as the result of the sale by Hernasco of approximately 18,000 acres of undeveloped land in 1966. From this sale, Hernasco took a purchase-money mortgage of approximately $3,900,000 which generated income at the rate of 7 percent. Based on the above sale, McCune concluded that Hernasco could reasonably be expected to sell its remaining 28,604 acres of unimproved land at a price as favorable as that obtained for the sale of the 18,000 acres. Using this supposition as his premise, petitioner's expert computed an estimated possible increase in dividend income in the amount of $3.14 per share.

In arriving at this $3.14 dividend increase, McCune assumed that the remaining 28,604 acres held by Hernasco would be sold at $300 per acre (the value of land as stipulated by the parties) or an aggregate of $8,581,200. From this sales price McCune subtracted the anticipated selling cost which the parties stipulated as 10 percent of the gross sales price. McCune next deducted the cost basis in this land and the capital gains tax which would result from this hypothetical sale and arrived at a net profit of $5,610,605. Finally, he added back the cost basis of the undeveloped acreage and obtained a base for additional potential dividends in the amount of $5,852,879. McCune made the assumption that this base would also generate income at 7 percent equal to $409,702 ($5,852,879 x 7 percent). He then added the income on the existing purchase money mortgage of approximately $3,900,000 x 7 percent or $273,000, creating a total estimated income of $682,702. An estimated Federal income tax of $341,351 was deducted from the estimated income leaving an estimated amount available for additional dividends of $341,351. The division of this sum of $341,351 by the 108,675 outstanding shares of Anahma yields a potential increase in dividends of $3.14 per share. McCune added this $3.14 to the actual 1966 dividend per share ($2.90) and thus determined that $6.04 was the estimated possible dividend per share of Anahma stock.

Having arrived at the potential dividend income per share, petitioner's expert decided that the next important concern

would be the establishment of a warranted yield rate for capital committed to the purchase of this stock. According to McCune, a warranted yield would be a yield commensurate with the risk implicit in the subject stock.

After noting that the yield on marketed securities ranged from 3.22 percent on high-grade common industrials to 6.07 percent on BAA bonds, McCune determined that a potential purchaser would demand an 8-percent return on his investment because of its inherent lack of marketability and the alleged incapacity to utilize it as collateral. On the basis of the $2.90 dividend, a buyer would pay $36.25 per share to achieve an 8-percent return, but this buyer would also realize that the possible $6.04 dividend would require him to pay $75.50 per share to create an 8-percent return. Based on these conclusions, McCune reasoned that since a purchaser would have no way of knowing when the income level might reach the $6 range, such a buyer would conclude that the purchase price per share should be an amount between $36.25 and $75.50. He finally decided that a reasonable fair market value as of June 11, 1967, for the 2,500 shares of Anahma stock would be $60 per share.

In direct contrast, the respondent's expert, O'Farrell, utilized the net asset valuation method and then discounted the net asset value by certain factors which he deemed appropriate.

At the date of valuation, Anahma's net asset value was $21,019,843 or $193.42 per share. This value per share was arrived at after allowing a hypothetical 10-percent expense that would be incurred in disposing of Hernasco's real estate.

O'Farrell's next step in valuing this stock was to study closed-end investment companies traded in the marketplace on the valuation date. Respondent maintains that these investment companies were used merely to establish a spread of market prices and discount rates of such companies within the market-place, thereby creating a representative pattern of marketplace discounting of investment companies.

The average discount for all of the companies considered was approximately 20 percent with the largest discount being 31.6 percent. O'Farrell testified that because there was uncertainty in the marketplace about the effect trapped capital gains have on investment companies and because Anahma had such capital gains, he discounted the stock in question by 30 percent and arrived at the figure of $135.39 per share.

O'Farrell concluded that the value of $135.39 per share represented the selling price of the stock if it had been marketed on the valuation date; however, he also recognized that it was not immediately marketable since it was not registered with the Securities and Exchange Commission. Consequently, respondent's expert attempted to simulate a registered public offering. By studying the cost of other registered offerings at about the valuation date, he determined the cost of such an offering of 2,500 shares would be $39,600. O'Farrell then allowed an additional 4 percent of his established market price ($16,900) to reflect other expense and risk of market change in the registration period. Under this calculation the total cost of registration would be $56,500. As a result of this final allowance for a hypothetical registration, respondent's expert concluded that the fair market value of 2,500 shares of Anahma stock as of the valuation date was $112.80 per share.

As we said at the outset, we find little fault with either appraiser's application of the method of valuation he chose to the facts in this case. McCune appears to have been generous in his assumptions as to the increase in the potential dividend base of Hernasco and the probability that this would all pass through to the stockholders of Anahma. On the other hand, we doubt that a buyer who wanted this stock could insist on an 8-percent rate of return on his investment in view of the magnitude of the underlying assets of the company. Sixty dollars per share would be less than one-third of the value of the assets represented by that share—and there was little danger that the value of those assets would decrease in the near future. The buyer would have to recognize that he would have to accept a lower yield on his investment or look elsewhere.

In light of the investment philosophy and past investment record of Anahma, we must conclude that a method of valuation based on income yield alone is unrealistic in this case. In *Hamm v. Commissioner*, 325 F.2d 934 (C.A. 8, 1963), the appellate court, in commenting on a similar taxpayer argument, stated: [4]

This narrow approach, based on future earnings and dividends, would exclude any consideration of underlying asset value. It was rejected by the Tax Court as not furnishing "a reliable criteria of the value of the shares of stock here involved".

[4] See also *Paulina DuPont Dean*, T.C.Memo. 1960-54.

Here again the taxpayers' argument is one more appropriately addressed to the trier of fact than to us. It did not sell itself to the Tax Court. Future earnings and dividend prospects are not the only factors having recognizable validity. United was a family company. Its history demonstrates that it was not managed with a view to dividends. Long range appreciation, inflation hedging, and other investment considerations all seem to have been inherent in its policy. As an appellate court we cannot say that the underlying asset value is without significance. The average small investor on the street might not be attracted to United stock because of the family control and other features but an investor with knowledge, acumen, and substantial capital might be. * * *

O'Farrell's basic figure of $193.42 for the net asset value of a share of Anahma's stock is based on stipulated figures. His discount of 30 percent based on the discount of net asset values being applied in the market in fixing the trading price of stocks of closed-end investment companies seems realistic. However, there being no market for this stock, this discount figure may be low. O'Farrell then simulated the cost of registering and listing this stock so it would have a market similar to that of the investment companies, and discounted the indicated market selling price of about $135 per share by the per share cost of so doing. While the per share cost of this exercise seems reasonable the result is somewhat artificial. There is no assurance that if Anahma "went public" with its stock, that the stock would sell for $135 per share. The yield on most of the investment company stocks used by O'Farrell to get his discount figure was greater than the yield that would be produced by the Anahma stock paying a $6 dividend and selling for $135 per share. Furthermore, there appears to be little chance that the management of Anahma would put its stock on the open market.

Weighing all of the various factors that we can think of that are applicable and would be given consideration in a bargaining session between a willing seller and a willing buyer of this stock we have determined that a bargain would be struck at $100 per share.[5] If the dividend reaches $6 per share it would produce a yield of 6 percent on this purchase price, which is reasonable. While such a price would reflect only about 50 percent of the net asset value of the stock it is not likely that that value will be made available to the stockholders anytime soon. Possibly

[5] In our computation we have given more weight to net asset value than to potential yield on investment, which we think is proper under these circumstances. See *Paulina DuPont Dean,* T.C.Memo. 1960-54. But see also *Mary A. B. du Pont Laird, et al., Executors,* 38 B.T.A. 926 (1938); *Estate of Ethel C. Dooly,* T.C.Memo. 1972-164.

neither the buyer nor the seller will be happy with that price but that is what makes a bargain.

## Second Issue

The final issue for determination is whether the estate is entitled to a deduction for certain legal fees incurred by Ilene Kari-Davies Heckscher in an action brought by the trustee for instructions as to the proper disposition of the trust corpus. In the year 1968, the trustee of the trust over which decedent had exercised by will a power of appointment in favor of Ilene was notified of an adverse claim with respect to this corpus based upon a contractual arrangement between decedent and his former wife, Luella. The trustee filed a petition with the Supreme Court of the State of New York seeking instructions as to the proper distribution of the corpus of the trust. Luella and Ilene joined the proceeding as interested parties and judgment was finally rendered to the effect that the contract was void against the appointment to Ilene. In connection with this proceeding, Ilene paid attorney's fees in the amount of $14,170.69.

Petitioner's contention is that the estate is entitled to a deduction for these legal fees pursuant to section 2053.[6]

We have concluded that subsection (b) of section 2053, rather than subsection (a), is applicable in the instant case because the attorney's fees, if deductible, would be classified as administration expenses incurred in administering property, the

---

[6] SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

    (1) for funeral expenses,

    (2) for administration expenses,

    (3) for claims against the estate, and

    (4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate,

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

(b) OTHER ADMINISTRATION EXPENSES.—Subject to the limitations in paragraph (1) of subsection (c), there shall be deducted in determining the taxable estate amounts representing expenses incurred in administering property not subject to claims which is included in the gross estate to the same extent such amounts would be allowable as a deduction under subsection (a) if such property were subject to claims, and such amounts are paid before the expiration of the period of limitation for assessment provided in section 6501.

trust corpus, not subject to claims.[7]

For our present purposes, section 2053(b) states basically that there shall be deducted in determining the taxable estate amounts representing expenses incurred in administering property not subject to claims which is included in the gross estate to the same extent such amounts would be allowable as a deduction under subsection (a) if such property were subject to claims. The regulations of the Commissioner mirror this requirement. Secs. 20.2053-8(a), 20.2053-1(a)(1) and (2), Estate Tax Regs.

Additionally, section 20.2053-8, Estate Tax Regs., provides:

(b) These expenses may be allowed as deductions only to the extent that they would be allowed as deductions under the first category if the property were subject to claims. See § 20.2053-3. The only expenses in administering property not subject to claims which are allowed as deductions are those occasioned by the decedent's death and incurred in settling the decedent's interest in the property or vesting good title to the property in the beneficiaries. Expenses not coming within the description in the preceding sentence but incurred on behalf of the transferees are not deductible.

(c) The principles set forth in paragraphs (b), (c), and (d) of § 20.2053-3 (relating to the allowance of executor's commissions, attorney's fees, and miscellaneous administration expenses of the first category) are applied in determining the extent to which trustee's commissions, attorney's and accountant's fees, and miscellaneous administration expenses are allowed in connection with the administration of property not subject to claims.

Finally, section 20.2053-3(c)(3), Estate Tax Regs., states:

Attorney's fees incurred by beneficiaries incident to litigation as to their respective interest do not constitute a proper deduction, inasmuch as expenses of this character are incurred on behalf of the beneficiaries personally and are not administration expenses.

This section of the regulations has received the specific approval of this Court in *Estate of Louvine M. Baldwin,* 59 T.C. 654 (1973); *Estate of William A. Landers, Sr.,* 38 T.C. 828 (1960); *Estate of Leo J. Dutcher,* 34 T.C. 918 (1960). Of course this section of the regulations relates to attorney's fees incurred with

---

[7] Sec. 2053(a) is applicable only if the trust property is property subject to claims under Florida law and would bear the burden of the payment of the enumerated deductions in settlement of the decedent's estate. Sec. 2053(c)(2), I.R.C. 1954; sec. 20.2053-1(c), Estate Tax Regs.

The trust corpus was not in fact a part of the probate estate hence is "property not subject to claims." *Mary E. Burrow Trust,* 39 T.C. 1080 (1963). Also, for reasons we will not detail here because the parties have not argued to the contrary, we conclude that under Florida law, a trust corpus established by another over which a decedent has exercised his general power of appointment would not be subject to claims against the decedent's estate. See *Hodges v. Logan,* 82 So. 2d 885 (Fla. 1955).

respect to property subject to claims, but it is specifically made applicable to attorney's fees incurred with respect to property not subject to claims by section 20.2053-8(c) quoted above.

The Court of Appeals for the Fifth Circuit considered the applicability of section 20.2053-3(c)(3) in *Pitner v. United States*, 388 F.2d 651 (C.A. 5, 1967). In that case two brothers had agreed to make and did make identical mutual wills, which left the residuary estate to their nieces. Upon the death of the survivor, J. E. Sexton, strangers to decedent offered for probate a will of J. E. Sexton which purported to leave his entire estate to one of the strangers. For reasons peculiar to Texas law, instead of offering decedent's original will for probate, the nieces contested the application for probate of the second will and also brought suit to try title to the estate of J. E. Sexton, based on the contract to make mutual wills. The nieces were successful in both contests and acquired title to the estate property as intestate heirs of J. E. Sexton. An estate tax refund suit was brought to allow deduction of the attorney's fees incurred in connection with this litigation. In allowing the deduction, the Court recognized that the nieces were acting in their own self-interest but also found that the litigation was essential to the proper settlement of the estate. In considering section 20.2053-3(c)(3) the Court said:

> Section 20.2053-3(c)(3) of the Treasury Regulations provides that attorneys' fees incurred by beneficiaries incident to litigation as to their respective interests are not administration expenses, and therefore, are not deductible. We view this section as applying where beneficiaries are suing to determine their share in the estate as against other beneficiaries, not, as here, where parties have sued to have their interest in the estate in general—the total estate—recognized as opposed to others with no legitimate interest in the estate whatsoever.

In the case under consideration the trustee brought the suit for instructions on how to divide the trust estate; there was no question that Ilene was the beneficiary under decedent's will, it was just a question whether Luella's claim to a part of the estate should be recognized. We, therefore, conclude that section 20.2053-3(c)(3) of the regulations is applicable here and that the attorney's fees paid by Ilene are not deductible as administration expenses by the estate.

This Court dealt with the deductibility of expenses incurred in connection with property not subject to claims under Code section 2053(b) in *Mary E. Burrow Trust*, 39 T.C. 1080 (1963),

affd. 333 F.2d 66 (C.A. 10, 1964). We interpreted the section to mean "that the administration expenses sought to be deducted under subsection (b) should be of the same nature as administration expenses deductible under subsection (a), i.e., that the expenses must be incurred in winding up the affairs of the deceased." See also *Estate of William A. Landers, Sr., supra.* In *Estate of John J. Toeller,* 6 T.C. 832 (1946), affd. 165 F.2d 665 (C.A. 7, 1948), this Court would not allow as a deduction under section 812(b)(2) of the 1939 Code, the predecessor of section 2053(a) of the 1954 Code, expenditures made by the trustee out of trust corpus (which was included in decedent's estate for tax purposes) for attorney's fees arising out of an action brought by the trustee for construction of the trust, saying "we are of the opinion that none of these [expenses] constitutes an allowable deduction for expenses of administration under the statute and regulations."

The record in this case does not reveal why Ilene employed her own attorney to participate in the action brought by the trustee for instructions or why her attorney's services were necessary or for the benefit of the trust or the estate. Sec. 20.2053-3(a), Estate Tax Regs. We assume the attorney's fees were incurred for the protection of Ilene's own interests. We conclude that they were not "incurred in winding up the affairs of the deceased" and are not deductible as administration expenses of either the estate or property not subject to claims but included in the gross estate for tax purposes. See *Emma Peabody Abbett,* 17 T.C. 1293 (1952); *Estate of Robert H. Hartley,* 5 T.C. 645 (1945).

*Decision will be entered under Rule 155.*