ESTATE OF MARGUERITE S. MILLIKIN, DECEASED, QUENTIN ALEXANDER, EXECUTOR, AND SEVERANCE A. MILLIKIN TRUST B, SOCIETY NATIONAL BANK, F.K.A. AMERITRUST COMPANY, TRUSTEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Millikin v. Commissioner
Docket No. 9928-93
United States Tax Court
T.C. Memo 1995-288; 1995 Tax Ct. Memo LEXIS 287; 69 T.C.M. (CCH) 3032; June 27, 1995, Filed *287 Petitioners' Motion To Amend the Pleadings to Conform To The Evidence will be granted and entered under Rule 155. For petitioners: Robert E. Glaser, Charles W. Landefeld, and Brian W. Fitzsimons. For respondent: Terry W. Vincent. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined that there is a $ 682,367 deficiency in the estate tax of the Estate of Marguerite S. Millikin, deceased, and that the Severance A. Millikin Trust B is liable for a generation-skipping transfer tax of $ 67,529. The issues for decision are: 1. Whether petitioner Estate of Marguerite S. Millikin may deduct certain administration expenses incurred to maintain and sell realty known as Ripplestone. We hold that it may deduct costs to maintain Ripplestone until March 16, 1990, but it may not deduct costs to sell or maintain Ripplestone after March 1990. 2. Whether petitioners may amend the pleadings to conform to the evidence. We hold that they may, and that the fair market value of petitioner Severance A. Millikin Trust B on the date of death of Marguerite S. Millikin is reduced by an accrued but unpaid real estate tax liability of $ 35,018.06. References to decedent *288 are to Marguerite S. Millikin. References to the estate are to her estate. Unless otherwise noted, section references are to the Internal Revenue Code in effect during the time relevant to this case. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Decedent was a resident of Ohio when she died on June 18, 1989. Decedent was the surviving spouse of Severance A. Millikin. Decedent's husband died in 1985. Decedent executed her will on November 19, 1987. In her will, decedent left the residue of her estate to her inter vivos trust. Quentin Alexander (Alexander) is the executor of decedent's estate. His office is in Cleveland, Ohio. He is a retired attorney. The Millikins were the aunt and uncle of Alexander's wife. Society National Bank, formerly Ameritrust Co. (Ameritrust), is trustee of the Severance A. Millikin Trust B (Trust B). Its principal offices are in Cleveland, Ohio. 2. The Millikin Trusts
In 1976, decedent's husband established three trusts. He named Ameritrust trustee for the trusts. Decedent's husband gave the trustee the power to sell any trust *289 property with approval of the advisory trustees and without any order of a court. The trustee could not, without approval by the trustor or the advisory trustees, transfer property, lend money to the trusts, lend trust money to others, settle claims for or against the trusts, or vote securities held by the trusts. a. Trust A
Decedent's husband established a charitable trust known as the Severance A. and Marguerite S. Millikin Endowment Fund Trust A (Trust A). b. Trust B
On February 23, 1976, decedent's husband established Trust B as a marital deduction trust. He modified it on June 13, 1978, and August 22, 1979. Decedent's husband appointed Alexander and decedent as advisory trustees for Trust B. In accordance with his will, Ripplestone was transferred to Trust B on May 7, 1986. Ripplestone was to be held by Trust B for decedent's benefit as long as she wanted to live there. Decedent's husband gave decedent a general power of appointment for all Trust B property, including Ripplestone. If decedent did not fully exercise her power of appointment, any unappointed part of the corpus of Trust B was to be transferred to the residuary trust known as Severance A. Millikin Trust *290 C (Trust C) upon decedent's death. According to the trust document, Trust B and/or Trust C (described below) were to pay all expenses necessary to maintain Ripplestone during decedent's life. The trust document also provided that the trustee should distribute the entire corpus of Trust B according to decedent's will if she specifically exercised her power of appointment. Under decedent's will, Trust B was to pay all Federal and State death taxes attributable to the inclusion of Trust B in her gross estate. Trust B held Ripplestone when decedent died. Trust B also held other assets when decedent died, including $ 4,175,000 in U.S. Treasury bills due June 29, 1989, 71,394 shares of Exxon worth $ 3,148,029.19, 10,613 shares of General Electric Co. worth $ 563,152.31, 2,998 shares of Dow Chemical Co. worth $ 265,416.69, and $ 900,000 in municipal bonds, not including accrued dividends and interest. When decedent died, Trust B had accrued liabilities of $ 6,917.28 which were for Trustee fees. When decedent died, Trust B held assets which were worth $ 9,026,540.75, not including Ripplestone. Decedent's gross estate included the property held by Trust B because it was subject to her general *291 power of appointment. Sec. 2041(a). However, the property held by Trust B was not a probate asset and was not subject to claims against decedent's estate. Decedent and her husband intended that the corpus of Trust B, including Ripplestone, would not be subject to the jurisdiction of the probate court. After decedent died, Alexander was the sole advisory trustee for Trust B. At the time of trial, Trust B held assets, not including Ripplestone, worth about $ 250,000. c. Trust C
Decedent's husband established Trust C on February 23, 1976. Decedent's husband appointed Alexander and decedent as advisory trustees for Trust C. After decedent died, Alexander was the sole advisory trustee for Trust C. When decedent died, Trust C was to be divided into three equal shares to be held in trust for the benefit of the issue of three named relatives of decedent's husband. Each of the three shares was held for the benefit of the issue per stirpes of the named relatives. Trust C had 28 beneficiaries. The three trusts were to terminate 21 years after the death of the last survivor of the established beneficiaries. 3. Ripplestone
Decedent's husband bought Ripplestone around 1960. Ripplestone *292 is located in Gates Mills, Ohio. It has about 150 acres. Buildings on Ripplestone include a 7,900-square-foot stone main house built in 1924 and modified in 1960, a detached three-car garage with apartments, a stone pool house, a gate house and stable group, a chauffeur's cottage, and an old farmhouse with a barn. The Millikins added a large living room in 1960 that they used as a gallery to display their extensive art collection. Ripplestone has an extensive electrical/HVAC system to control climate and humidity for the art collection. Ripplestone has a swimming pool, a tennis court, tar and chip drives, a stone bridge, a pedestrian suspension bridge, stone and split-rail fencing, a lawn, and landscaping. Ripplestone had six underground fuel storage tanks. Decedent's family had used the tanks to store fuel oil, leaded gasoline, and unleaded gasoline for their private consumption. Leaks in the tanks contaminated the soil near the farmhouse and the soil and groundwater near the garage apartment. The cost to maintain Ripplestone was substantial. Society National Bank maintained Ripplestone so that it could be sold. As previously stated, Ripplestone was transferred to Trust B pursuant *293 to decedent's husband's will. Trust B paid the expenses to maintain Ripplestone prior to decedent's death. Decedent died on June 18, 1989. At that time, legal title to Ripplestone was held by Ameritrust. Trust B had Ripplestone appraised on July 28, 1989, and December 9, 1991. The fair market value of Ripplestone was $ 2,400,000 when decedent died. Ripplestone was offered for sale for $ 4,200,000 through Smythe, Cramer Co., a real estate agency, on March 20, 1990. As of the date of trial, it had cost $ 170,084 to remove the six underground fuel storage tanks from Ripplestone in 1991 and to remediate the contaminated area. Trust C sold Ripplestone for $ 2,301,750 on April 20, 1994. Selling expenses were $ 142,079.70. 4. Administration of Decedent's Estate
When decedent died, her estate consisted primarily of jewelry and an extensive collection of European paintings and furniture and oriental porcelains. Decedent's will was probated in the Probate Court of Cuyahoga County, Ohio. Under decedent's will, her jewelry was to be sold, and the proceeds were to be distributed to charities. The art objects were to be offered to the Cleveland Museum of Art, which had the right of *294 selection. The balance was to be sold, and the proceeds were to be distributed to charities. In decedent's will, she partially exercised her power of appointment over Trust B in two ways. First, she appointed 20 percent of the principal of Trust B or $ 2 million, whichever was less, to Ameritrust, as trustee, to be allocated to Trust A. She also exercised her power of appointment over Trust B as follows: C. Further, in the event that there shall be in existence at the time of my death the aforesaid Trust B, then I appoint to my estate from the residue of the principal of said Trust B as the same is constituted at the time of my death, remaining after the appointment made in part B immediately above, to be paid and disbursed to the Executor of my estate such total amount as he may certify to the Trustee under said Trust Agreement as necessary or requisite to fully pay all estate, inheritance, succession, legacy, transfer and other taxes of a similar nature, and interest thereon, if any, that shall become payable by reason of my death and with respect to the said power of appointment given to me under the said Trust Agreement; said amount to be equal to the difference, if any, between *295 the amount of such taxes and interest actually payable by my Executor, minus the amount of such taxes and interest, if any, which would have been payable if such property subject to said power had not been included in my estate for the purpose of such taxes.
In her will, decedent authorized her executor to sell any of her estate as he deemed necessary without obtaining the approval of any court or person. When decedent died, Alexander assumed control of the property and Ripplestone. He and the trustee decided to sell Ripplestone as soon as possible, but not before decedent's personal property in Ripplestone was distributed. Decedent's estate paid expenses to maintain and preserve decedent's personal property and Ripplestone. After decedent died, the estate reduced the Ripplestone staff but kept enough people to secure and maintain the house and grounds. The Cleveland Museum of Art selected the items it wanted, and the estate sold the remaining personal property in February or March 1990. The estate filed its estate tax return on March 16, 1990, and paid Federal and State taxes. Alexander signed the return. The return included a $ 150,000 administrative expense deduction for estimated *296 costs to sell Ripplestone. Ripplestone was listed for sale in March 1990. Ripplestone could not be sold quickly because of its size and value, leaking underground storage tanks, and the inability to subdivide the property. Each offer to buy Ripplestone was subject to various environmental or subdivision conditions. There were no guidelines for the environmental remediation of residential property such as Ripplestone. The estate and Trust B decided to use commercial remediation standards. Alexander paid expenses of: (a) $ 517,214.08 for household employees and deducted $ 185,723.76 as administration expenses; (b) $ 145,815.27 for utilities and maintenance and deducted $ 15,720.81; (c) $ 16,902.04 for supplies for grounds and buildings and deducted $ 4,997.34; and (d) $ 77,424.05 for repairs, equipment, and insurance and deducted $ 7,099.91. Alexander paid an appraisal fee of $ 5,931.81. He paid other deductible amounts through September 15, 1993, totaling $ 109,747.03. Alexander paid an amount for office costs which is not specified in the record and estimated additional office costs which he reported on Schedule J of Form 706. The parties agree that the estate may deduct $ 26,097.31 *297 as administration expenses for office costs. The estate paid attorney's fees to the law firm of Arter & Hadden. The estate did not pay Alexander for being executor. Alexander estimated on Schedule J of Form 706 that the estate would incur $ 150,000 in attorney's fees. Attorney's fees as of September 15, 1993, were $ 238,812. When Ripplestone was appraised after decedent died, the appraisals were based on the assumptions that Ripplestone could be subdivided and that Ripplestone had no environmental problems. Trust B gave funds to the estate to pay most of the expenses to maintain and sell Ripplestone. Decedent's will required that her estate pay her estate taxes, but that Trust B pay all estate and death taxes attributable to Trust B being included in decedent's gross estate. Decedent's will directed Alexander to certify to the Trust B trustee the amount attributable to Trust B and for Trust B to pay that amount to the estate. That amount was the difference between the estate taxes with Trust B included in the gross estate and estate taxes without Trust B. Decedent's estate reported the assets of Trust B as being included in her estate on the estate tax return. The estate paid *298 $ 4,581,645.04 in Federal and Ohio estate and death taxes. Decedent's estate filed a series of accountings with the probate court which listed all of the estate's expenditures and the disbursements at issue here. The accountings included some expenses relating to items which were not part of the probate estate. The probate court has not rejected or disallowed any of the expenditures in the accountings. 5. The Estate's Tax Return
Decedent's estate valued Ripplestone at $ 3,200,000 on its Federal estate tax return. Decedent's estate deducted $ 213,541.82 for maintenance and upkeep of Ripplestone and $ 150,000 for estimated selling costs. Decedent's estate did not deduct any expenses for administering property not subject to claims. OPINION 1. Deductibility of Expenses To Maintain and Sell Ripplestone
a. Background
Petitioners contend that they may deduct $ 757,356.27 as administration expenses under section 2053(b)[1] to maintain and sell Ripplestone after decedent's death. *299 An estate may deduct expenses to administer nonprobate property ("property not subject to claims") if: (i) The nonprobate property is included in the gross estate; (ii) the expenses are paid before the time to assess tax expires; and (iii) the expenses would be allowable under section 2053(a) if the property were probate property. Sec. 2053(b). Under former section 2053(b), property not subject to claims is nonprobate property, and property that is subject to claims is probate property. See Burrow Trust v. Commissioner, 39 T.C. 1080, 1088 (1963), affd. on other issues 333 F.2d 66 (10th Cir. 1964); sec. 20.2053-8, Estate Tax Regs. This principle remains valid under current section 2053(b). Estate of Heckscher v. Commissioner, 63 T.C. 485, 500-501 (1975). Trust B, including Ripplestone, is nonprobate property that is included in the estate because it was subject to decedent's general power of appointment. Sec. 2041(a). Respondent concedes that the administration expenses at issue were paid before the time to assess tax expired. Thus, the first two requirements are met. We must decide whether petitioners *300 meet the third requirement, that is, whether the estate could deduct the administration expenses at issue under section 2053(a) if the assets of Trust B (e.g., Ripplestone) were probate property. Sec. 2053(b). b. Whether Section 2053(a) Is Governed by State or Federal Law
An estate may deduct expenses which "are allowable by the laws of the jurisdiction * * * under which the estate is being administered." Sec. 2053(a). The Court of Appeals for the Sixth Circuit has held State law governs whether an estate may deduct administration expenses under section 2053(a). [2]Estate of Park v. Commissioner, 475 F.2d 673, 676 (6th Cir. 1973), revg. 57 T.C. 705 (1972). We apply Ohio law to decide whether petitioners may deduct the Ripplestone expenses. The parties dispute how Ohio law applies here. *301 c. Whether Expenses To Maintain and Sell Ripplestone Would Be Deductible UnderOhio Law If the Assets of Trust B Were Probate Assets
We must decide whether the expenses to maintain and sell Ripplestone would be deductible under Ohio law if Ripplestone were a probate asset. Sec. 2053(b); Estate of Park v. Commissioner, supra.When Federal tax liability depends on rights under State law, we must follow the interpretation of applicable State law by that State's highest court. If that court has not spoken on the issue, then we must give proper regard to any decisions of other courts in that State. Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967); Robinson v. Commissioner, 102 T.C. 116, 132 (1994). Ohio probate courts have exclusive jurisdiction to decide whether expenses paid by an executor are proper and reasonable. Ohio Rev. Code sec. 2101.24(A)(1)(c) (Page 1994); In re Kaffenberger's Estate, 71 Ohio App. 201, 48 N.E.2d 885 (1942). An Ohio probate court will allow an estate to pay administrative expenses which are necessary, reasonable, *302 and just. Ohio Rev. Code Ann. sec. 2113.36 (Page 1994); Union Commerce Bank v. Commissioner, 339 F.2d 163, 168 (6th Cir. 1964), affg. in part, revg. in part and remanding 39 T.C. 973 (1963). Thus, we must decide whether the expenses at issue were necessary, reasonable, and just. We conclude that they were not necessary. d. Whether the Expenses at Issue Were Necessary
The expenses to maintain Ripplestone until decedent's personal property was distributed were necessary. However, expenses to maintain and sell Ripplestone which the estate and Trust B incurred after that time were not necessary. The estate preserved decedent's personal property until it was distributed. This was necessary because decedent provided in her will that the Cleveland Museum of Art could select articles that it wanted. Until the museum did so, the estate had to properly maintain decedent's paintings, furniture, and porcelain. The estate distributed the rest of decedent's personal property in February or March 1990, after the museum had made its selections. After it did so, and filed the estate tax return on March 16, 1990, the estate and Trust *303 B had no reason not to distribute Ripplestone according to the trust agreement. The trust agreement provided that upon decedent's death, the unappointed portion of Trust B was to be distributed to Trust C. Trust B held assets, such as stocks, securities, and investment accounts, which were worth $ 9,026,540.75, not including Ripplestone, when decedent died. Decedent partially exercised her power of appointment in her will by providing that 20 percent of the principal of Trust B or $ 2 million, whichever was less, be transferred to Trust A, and that Trust B was to pay the estate taxes caused by Trust B being included in decedent's gross estate. Alexander was to certify and Trust B was to pay that amount to the estate. At that point, Trust B, the marital deduction trust, had no further reason to exist. However, Trust B did not transfer the remaining assets to Trust C. Instead, income from the assets of Trust B was transferred to the beneficiaries of Trust C, and Ripplestone was listed for sale. The trust agreement did not require court approval to transfer Ripplestone from Trust B to Trust C. However, instead of distributing Ripplestone to Trust C, petitioners decided to sell Ripplestone. *304 Trust B would necessarily incur expenses to maintain and sell Ripplestone. The sale of Ripplestone appears to be to the detriment of Trust B and to benefit the Trust C beneficiaries. Because it was not necessary to sell Ripplestone, it was not necessary for Trust B to bear the expenses of maintaining Ripplestone until it was sold. Petitioners contend that the estate had to sell Ripplestone because: (a) Trust B had to pay the estate tax deficiency and generation-skipping transfer taxes; and (b) there were 28 beneficiaries to the assets of Trust B. Both of petitioners' reasons are contradicted by the record. Petitioners' tax reason for selling Ripplestone contradicts the facts of this case. Petitioners filed their estate tax return on March 16, 1990. Alexander signed the return indicating that the return was true, correct, and complete. The estate tax return shows that petitioners intended to sell Ripplestone as shown by the $ 150,000 deduction for estimated selling expenses. Petitioners listed Ripplestone for sale in March 1990 soon after the estate filed its estate tax return. Petitioners listed Ripplestone for sale about 3 years before respondent issued the notices of deficiency *305 in this case. Thus, petitioners did not know the deficiency and generation-skipping tax determinations for the first 3 years that they tried to sell Ripplestone. Even if petitioners believed that they owed additional taxes, Trust B held assets which were worth $ 9,026,540.75, not including Ripplestone, when decedent died. Trust B's assets, other than Ripplestone, included stocks and other securities which were more liquid than Ripplestone. Under the trust agreement, when decedent died, the assets of Trust B were to be transferred to Trust C for the benefit of the 28 beneficiaries. Petitioners did not do so. Petitioners would not have incurred the expenses at issue to maintain and sell Ripplestone if they had transferred Ripplestone to Trust C soon after the estate distributed decedent's personal property that was in Ripplestone. In addition, Trust B would have benefited by transferring Ripplestone to Trust C rather than selling it, because Trust B would have avoided the costs at issue in this case. Petitioners' other reason for selling Ripplestone is also contradicted by the record. Petitioners contend that it was necessary to sell Ripplestone because "the death of Marguerite occasioned *306 the conversion of Ripplestone from a residence/gallery to an asset for the benefit of 28 different individuals." The trust agreement called for Trust C to be divided into three equal shares for the benefit of the issue of three named relatives of decedent's husband. The trust agreement states that the unappointed corpus of Trust B shall be distributed to Trust C upon decedent's death. It did not require Ripplestone to be sold and the proceeds distributed to the beneficiaries of Trust C. In addition, if petitioners' contention were true, the sale of Ripplestone would benefit the beneficiaries and not the estate or Trust B. As discussed above, the cost to maintain and sell Ripplestone was a detriment to the estate and Trust B. Whether expenses to maintain and sell Ripplestone are deductible is a question of fact. See Estate of Spiel v. Commissioner, T.C. Memo. 1989-532 (allowance of administration expense deductions for expenses relating to an inter vivos marital trust over which decedent had a general power of appointment not subject to summary judgment (Illinois law)). We conclude that decedent's estate did not incur the expenses at issue out of necessity. *307 2. Whether Petitioners May Amend Their Petition To Conform to the Evidence
After trial, petitioners moved to amend their petition to conform to the evidence. Petitioners contend that they should be allowed to raise the issue that respondent "erred by not reducing the value of property includable in the gross estate under section 2041 of the Internal Revenue Code to its net value." Specifically, petitioners seek to reduce the value of the gross estate by accrued but unpaid real estate tax liability of Trust B, which they allege to be $ 35,018.06. An issue not raised in the pleadings by the parties is generally not before the Court for decision. Frentz v. Commissioner, 44 T.C. 485, 490-491 (1965), affd. without discussion on this point 375 F.2d 662 (6th Cir. 1967). However, under Rule 41(b)(2), the parties may amend the pleadings to conform to the evidence presented at trial. Rule 41(b)(2) provides: (2) Other Evidence: If evidence is objected to at the trial on the ground that it is not within the issues raised by pleadings, then the Court may receive the evidence and at any time allow the pleadings to be amended *308 to conform to the proof, and shall do so freely when justice so requires and the objecting party fails to satisfy the Court that the admission of such evidence would prejudice such party in maintaining such party's position on the merits.
Counsel for respondent conceded that respondent would not be prejudiced if petitioners are allowed to amend their petition. We conclude that justice requires that we allow the pleadings to be amended to conform to the proof. Rule 41(b)(2). Respondent objects on the grounds that there is no evidence in the record that the real estate taxes are accrued but unpaid. We disagree. William Wright (Wright), vice president and manager of the trust, tax, and real estate section of the Trust B trustee, Society National Bank, testified that at the date of death there was approximately $ 35,000 in accrued but unpaid real estate taxes due. Respondent argues that Wright did not personally manage Trust B when decedent died in 1989. However, Wright had 23 years of experience working with trusts. He testified in detail about Trust B's activities from 1989 to 1993. Wright's testimony was consistent with the amount of Ripplestone's real estate taxes in 1988 and *309 1989. The parties filed a supplemental stipulation of fact which states that real estate taxes on Ripplestone were $ 11,460.76 for the second half of 1988 and $ 11,778.65 for each half of 1989. The accrued but unpaid real estate taxes on Ripplestone were $ 35,018.06. Petitioners' amended petition conforms to the evidence in the record. Petitioners' motion to amend their petition to conform to the evidence will be granted. The fair market value of Trust B on the date of death of Marguerite S. Millikin is reduced by the accrued but unpaid real estate tax liability on Ripplestone of $ 35,018.06. To reflect concessions and the foregoing, Petitioner' Motion To Amend the Pleadings to Conform To The Evidence will be granted and decision will be entered under Rule 155. Footnotes
1. Sec. 2053(b) provides: SEC. 2053 (b). Other Administration Expenses. -- Subject to the limitations in paragraph (1) of subsection (c), there shall be deducted in determining the taxable estate amounts representing expenses incurred in administering property not subject to claims which is included in the gross estate to the same extent such amounts would be allowable as a deduction under subsection (a) if such property were subject to claims, and such amounts are paid before the expiration of the period of limitation for assessment provided in section 6501↩.
2. We reach this conclusion based on the record regardless of which party bears the burden of proof. The expenses at issue must be necessary to the estate under both Federal and Ohio law. Thus, we would reach the same result under Federal law. In Estate of Posen v. Commissioner, 75 T.C. 355, 367 (1980), we held that State law alone does not govern deductibility under sec. 2053. In light of our conclusion above, we need not decide respondent's alternative arguments.↩