ESTATE OF OAKLEY J. HALL, DECEASED, SOUTHERN CALIFORNIA FIRST NATIONAL BANK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
Estate of Hall v. Commissioner
Docket No. 8611-71.
United States Tax Court
T.C. Memo 1975-141; 1975 Tax Ct. Memo LEXIS 226; 34 T.C.M. (CCH) 648; T.C.M. (RIA) 750141; May 15, 1975, Filed Jack M. Harrison and Raymond L. Heidemann, for the petitioner. Melvern Stein, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in Federal estate tax due from petitioner-estate in the amount of $587,953.96. By amendment to his answer respondent seeks additional deficiencies in the amount of $313,836.49. Following certain concessions by the parties, the issues remaining for decision are: (1) The fair market value at the date of decedent's death of 700,000 shares of stock of San Diego Marine Construction Co., which were properly included in decedent's gross estate, exclusive of certain investment real estate owned by the corporation; and (2) the fair market value at the date of decedent's death of the investment real estate located at 201 West Broadway, San Diego, Calif., which the parties agreed should be valued separately and added to the value of the stock of the corporation. FINDINGS OF FACT Certain facts have been stipulated and are found accordingly. The petitioner, Southern California *228 First National Bank is a national banking association and is the duly appointed and qualified executor of the will of Oakley J. Hall, decedent in the present case. The decedent died a resident of San Diego, Calif., on September 24, 1967. The estate of the decedent was administered under the jurisdiction of the State of California. On December 24, 1968, the petitioner filed an estate tax return with the district director of internal revenue at Los Angeles, Calif. The date of death was used as the date of valuation of the estate. At the time of his death, decedent owned as his separate property 700,000 shares of common stock of San Diego Marine Construction Co. (hereinafter Marine), a California corporation. These shares represented all of the outstanding shares of stock of Marine. Marine was incorporated under the laws of the State of California in 1938. There have never been any sales of shares of capital stock of Marine from which the fair market value of such shares could be determined as of September 24, 1967. As of September 24, 1967, Marine operated three divisions, the Marine Division, the Boat Division, and the Investment Division. The type of work undertaken by the *229 Marine Division consisted principally of naval ship repair and commercial repair, primarily of tuna fishing vessels. For the taxable year ended September 30, 1967, the Marine Division accounted for 86.7 percent of the corporation's total revenues from operations other than the investment in the property at 201 West Broadway. The Marine Division's gross receipts from government work versus nongovernment work for the fiscal years 1958 through 1967 are set forth below as follows: Government Work
Nongovernment Work Year Ended
Percent
Percent Sept.
of
of
Total 30
Amount
Total
Amount
Total
Amount
1958
$1,049,665
50.3
$1,038,017
49.7
$ 2,087,682
1959
540,089
33.5
1,073,257
66.5
1,613,346
1960
806,670
38.2
1,306 ,744
61.8
2,113,414
1961
626,979
34.2
1,206,747
65.8
1,833,726
1962
612,753
30.3
1,411,888
69.7
2,024,641
1963
990,396
39.7
1,507,151
60.3
2,497,547
1964
948,485
40.7
1,381,805
59.3
2,330,290
1965
2,567,933
56.6
1,970,152
43.4
4,538,085
1966
3,999,808
66.9
1,982,361
33.1
5,982,169
1967
4,022,644
75.2
1,327,260
24.8
5,349,904
The Marine Division occupied a 19.2-acre *230 site leased from the San Diego Unified Port District, which consisted of approximately 7.22 acres of industrial land, the remainder being tide land and harbor area seaward of the shipyard bulkheads and shoreline. In addition to this main site, the Marine Division also occupied a 12,525-square foot area adjuacent to the shipyard leased from San Diego Gas and Electric Co. and two parking lots located across the shipyard frontage road leased from the Atchinson, Topeka and Santa Fe Railway. Marine did not have facilities at the above location to repair naval vessels made of steel. This work was done either on the navy vessel or at U.S. Navy drydock facilities at San Diego and Coronado. On the valuation date, Marine was operating under a lease entered into with the San Diego Unified Port District on February 1, 1944. This lease was due to expire on January 31, 1969. A new lease with the Port Authority was executed on December 3, 1968, in which Marine agreed to spend a minimum of $1,250,000 within the next 5 years to restore the yard. Between October 1, 1967 and June 30, 1972, Marine did make restoration expenditures of over $1,800,000. This new lease ran for a period of 5 years and *231 gave Marine the option to extend it for nine additional 5-year terms. Marine, on September 24, 1967, employed approximately 350 people of which 300 represented the Marine Division yard's work force, all of whom were union members. These union members began a strike against the Marine Division on June 30, 1967, which was not settled until September 30, 1967. As of September 24, 1967, the directors of the corporation were Oakley J. Hall, Sr., Oakley J. Hall, Jr., and William G. Mirow. The corporate books showed an indebtedness to O. J. Hall, Sr., in the following amounts: Date
Amount
9-30-62
$ 465,611
9-30-63
447,611
9-30-64
273,611
9-30-65
213,611
9-30-66
253,611
9-30-67
193,611 For the years ending September 30, 1962 through September 30, 1967, the decedent did not draw a salary from the corporation nor did he receive or earn interest on the amount shown as loans on the corporate books. The Boat Division, known as the Star and Crescent Boat Co., which was acquired on March 1, 1961, was a commercial towing and harbor excursion business with a float-pier and a gift shop located at Broadway Pier on Harbor Drive, San Diego, Calif. The assets of the *232 Boat Division included three harbor excursion vessels, four commercial tugboats, and ten assorted barges. Marine's profit and loss statements for the taxable years ending September 30, 1962, through September 30, 1967, are as follows: 1962
1963
1964
REVENUE:
Construction operations
$2,022,278
$2,497,241
$2,329,234
Boat operations
924,363
1,194,214
558,342
Real Estate operations
150,994
52,250
52,250
Total revenue
$3,097,635
$3,743,705
$2,939,826
COST OF OPERATIONS
Prime costs of construction
operations:
Materials
$ 788,545
$1,068,653
$1,081,307
Labor
596,770
709,042
565,122
Boat operations
778,376
1,084,236
508,475
Real Estate operations
101,590
26,117
23,062
Plant overhead, administrative
& general expenses
727,758
759,044
615,560
Total cost of operations
$2,993,039
$3,647,092
$2,793,526
PROFIT FROM OPERATIONS
104,596
96,613
146,300
OTHER INCOME (EXPENSE):
Gain on sale of property
$0
$0
$ 159,440
Discounts earned
6,183
7,883
5,107
Interest - net
(407)
(285)
64,790
Miscellaneous
12,683
5,130
35,794
Other income - net
$ 18,459
$ 12,728
$ 265,131
INCOME BEFORE FEDERAL INCOME TAX
$ 123,055
$ 109,341
$ 411,431
FEDERAL INCOME TAX
58,489
45,716
176,294
NET INCOME
$ 64,566
$ 63,625
$ 235,137
RETAINED EARNINGS AT BEGINNING OF YEAR
219,613
284,179
347,804
RETAINED EARNINGS AT END OF YEAR
$ 284,179
$ 347,804
$ 582,941
*233 1965
1966
1967
REVENUE:
Ship & boat building & repairing
$3,499,335
$5,363,759
$5,349,903
Boat operations
534,444
793,635
823,997
Real Estate operations
52,250
52,250
49,999
Total revenue
$4,086,029
$6,209,644
$6,223,899
COST OF OPERATIONS
Prime costs of ship & boat building
& repairing:
Materjals
$1,585,628
$2,595,529
$2,590,117
Labor
1,024,083
1,185,697
1,372,706
Boat operations
415,379
578,400
669,496
Real Estate operations
20,559
18,954
9,228
Plant overhead, administrative, &
general expenses
1,104,684
1,163,482
1,163,162
Total cost of operations
$4,150,333
$5,542,062
$5,804,709
PROFIT (LOSS) FROM OPERATIONS
$ (64,304)
$ 667,582
$ 419,190
GAIN ON SALE OF VESSELS CONSTRUCTED
BY COMPANY
260,597
129,398
0
Total
$ 196,293
$ 796,980
$ 419,190
OTHER INCOME (EXPENSE):
Interest income
$ 73,092
$ 67,143
$ 79,587
Interest expense
0
(1,145)
(27,502)
Discounts earned
10,600
18,446
12,595
Miscellaneous
19,317
26,878
22,132
Total other income - net
$ 103,009
$ 111,322
$ 86,812
INCOME BEFORE FEDERAL INCOME TAX
$ 299,302
$ 908,302
$ 506,002
FEDERAL INCOME TAX:
Adjustments applicable to prior years
0
7,169
(685)
NET INCOME
$ 299,302
$ 915,471
$ 505,317
RETAINED EARNINGS AT BEGINNING OF
YEAR
582,941
931,373
901,128
Total
$ 882,243
$1,846,844
$1,406,445
ADD-Federal income tax adjustments
49,130
0
0
DEDUCT-Adjustments for deferred
Federal income tax
0
0
(76,000)
Distributions to shareholder
0
(945,716)
(536,613)
RETAINED EARNINGS AT END OF YEAR
$ 931,373
$ 901,128
$ 793,832
*234 A comparative balance sheet for Marine for the taxable years ending September 30, 1962 through September 30, 1967, is set forth below: In Re: Estate of Oakley J. Hall - Valuation Date: September 24, 1967 Comparative Balance Sheet - San Diego Marine Construction Co. - Reported in Dollars -
For Years Ending September 30
1967
1966
1965
1964
1963
1962
Assets
Cash
396,339
389,177
392,405
694,509
406,315
880,254
Notes
receivable
- current
375,000
350,000
75,000
75,000
Accounts
receivable -
Trade
461,553
513,684
207,580
169,415
369,925
319,796
Affiliates
12,655
59,456
79 ,557
Other
48,727
46,133
56,798
27,932
14,118
13,442
Inventories
124,013
83,824
108,013
93,768
74,755
77,584
Prepaid
expenses
42,316
17,614
31,081
23,189
26,934
25,209
Income tax
21,396
21,396
21,396
Other current
assets
291,431
329,296
1,055,340
311,268
439,103
354,085
Total current
assets
1,752,034
1,789,184
1,947,613
1,416,477
1,352,546
1,749,927
Notes
receivable,
less current
1,125,000
1,500,000
975,000
1,050,000
Property,
plant &
equipment,
net
1,677,535
1,392,830
1,393,201
1,548,785
2,432,947
2,041,006
Other assets
Total assets
4,554,569
4,682,014
4,315,814
4,015,262
3,785,493
3,790,933
Liabilities
Notes payable, current
560,000
560,000
60,000
39,000
38,614
18,000
Accounts payable -
Trade
101,079
208,799
301,840
122,694
133,963
116,175
Affiliates
27,623
29,990
13,169
7,120
4,919
Accrued salaries and wages
32,856
22,229
18,988
27,700
20,065
20,058
Accrued vacation and leave pay
34,024
22,690
24,441
17,938
21,082
18,033
Income tax, current
21,500
64,114
232,692
65,053
193,548
Other current liabilities
88,743
66,756
24,656
11,716
6,310
14,303
Total current liabilities
865,825
880,474
524,029
464,909
292,207
385,036
Notes payable, less current
193,611
253,611
213,611
273,611
447,611
465,611
Deferred Federal Income Tax
54,500
47,000
51,070
Total liabilities
1,113,936
1,134,085
737,640
785,520
790,888
850,647
Capital Stock
700,000
700,000
700,000
700,000
700,000
700,000
Additional paid-in capital
[1]
1,946,801
1,946,801
1,946,801
1,946,801
1,946,801
1,956,107
Retained earnings
793,832
901,128
931,373
582,941
347,804
284,179
Total Stockholders' Equity
3,440,633
3,547,929
3,578,174
3,229,742
2,994,605
2,940,286
Total Liabilities and capital
4,554,569
4,682,014
4,315,814
4,015,262
3,785,493
3,790,933
Working Capital Ratio
2.0-1
2.0-1
3.7-1
3.0-2
4.6-1
4.5-1
*235 The following table is a comparative statement of the income of Marine for the taxable years ending September 30, 1962 through September 30, 1967. This table reflects adjustments to exclude net rental income from the investment property of Marine and nonrecurring gain on the sale of capital assets in fiscal 1964 as an extraordinary income item. Since Marine in the fiscal years 1965 through 1967 elected to be treated as a subchapter S corporation, taxes, as estimated in the table, were computed on a standard corporate tax basis. With the one exception noted below, both parties obtained the results as shown in this table. SAN DIEGO MARINE CONSTRUCTION CO. COMPARATIVE STATEMENTS OF INCOME(a) 1962-67
Years Ended September 30
1962
1963
1964
1965
1966
1967
$
$
$
$
$
$
Revenue(c)
2,946,641
3,691,455
2,887,576
4,033,779
6,157,394
6,173,900
Cost of
Operations:
Prime Cost of Ship and Boat Repairs:
Materials
788,545
1,068,653
1,081,307
1,585,628
2,595,529
2,590,117
Labor
596,770
709,042
565,122
1,024,083
1,185,697
1,372,706
Depreciation
224,843
271,506
138,051
145,765
170,251
213,891
Other
1,281,291
1,571,774
985,984
1,374,298
1,572,776
1,618,767
Total
2,891,449
3,620,975
2,770,464
4,129,774
5,524,253
5,795,481
Balance
55,192
70,480
117,112
(95,995)
633,141
378,419
Other Income:
Gain on sale of
vessels constructed by
company
for sale
260,597
129,398
Miscellaneous
18,459
12,728
105,691
103,009
112,466
86,812
Net rental income
-201 West Broadway
49,404
26,133
29,188
31,691
33,296
40,771
Gain on Sale of
Capital Assets:
Vessels
159,440
Other
Net income
123,055
109,341
411,431
299,302
908,301
506,002
Less Nonrecurring
and Investment
Income:
Gain on sale of capital assets
(159,440)
Net rental income
[1]/
-201 West Broadway
(49,404)
(26,133)
(29,188)
(31,691)
(33,296)
(40,771)
Net income
(adjusted) before
federal
income tax
73,651
83,208
222,803
267,611
875,005
465,231
Less federal
income tax(b)
32,799
37,768
106,197
123,165
413,502
216,811
Net income
(adjusted) after
federal
income tax
40,852
45,440
116,606
144,446
461,503
248,420
*236 Notes: (a)Adjusted to eliminate net rental income from investment real property located at 201 West Broadway, San Diego, California, and for nonrecurring gain on sale of capital assets. (b)As computed by the Estate. (c)From operations - other than from 201 West Broadway investment property. Parentheses indicate red figures. Source: Data provided by the Estate. In July 1972, Marine sold the Marine Division to Campbell Industries, Inc., a competitor shipyard company in San Diego, for total consideration of approximately $4.6 million, payable through a combination of cash of $694,130, a promissory note in the amount of $750,000, and the remainder by assumption of liabilities. During this time, Campbell had a large backlog of work and needed additional facilities. Consequently Campbell acquired the Marine Division in order to obtain its assets, primary consideration being given to the relatively new lease held by the Marine Division as a very important asset and a major factor in the price paid for the facilities of the Marine Division. Campbell was not interested *237 in acquiring the stock of Marine as a going business. Marine, on the date of decedent's death, also held investment real property located at 201-251 West Broadway in San Diego, Calif. This property is on the south side of Broadway between Front and Union Streets. The legal description of this property is Lots A, B, C, D, I, J, K, and L, Block 56, Horton's Addition. This real estate has a 200-foot frontage on Broadway and a depth of 200 feet containing 40,000 square feet. At the valuation date, a part of the property was used as a bus depot for Continental Trailways and had a large parking garage in the rear which was separately rented. The Broadway frontages were divided into smaller store spaces used as a jewelry store, a souvenir shop, a cocktail lounge, a restaurant, and a waiting room for Continental Trailways. Improvements on the land consisted of a one-story masonry building containing 40,000 square feet. The northerly 70 feet of the building was divided into stores catering to retail trade. The southerly or rear portion of the building was used as garage and storage space. During the period in issue, this building was approximately 50 years old. As of the date of valuation, *238 there had been no development of property for commercial office buildings or otherwise of any significance south of Broadway in San Diego. The U.S. Government had under consideration the construction of a Federal office building and courthouse in San Diego since 1961 or 1962. Marine's investment property was one of several locations considered to be a suitable site for the building. However, a letter from the General Services Administration of the United States to the mayor of San Diego, dated September 8, 1967, indicates that, as of that date, no specific land in San Diego had been selected or approved by the General Services Administration as a site for the Federal buildings project. This letter contained a list of numerous sites which were deemed acceptable. Additionally, this Federal building project was not approved by the Public Works Committees of Congress until May 9, 1968. Eventually the Federal government, under a purchase agreement dated December 28, 1969, involving an exchange of properties, obtained this property plus additional property as the building site for a new Federal courthouse. The Federal building site included not only the investment property which *239 had been owned by Marine but also land owned by Mary F. Amaral, the First Gray Line West Corporation, and the City of San Diego. Amaral and First Gray Line were willing to sell their real property for cash but were not interested in trading for excess Federal land. After the death of decedent, Marine conveyed the investment property to decedent's sons, Oakley J. Hall, Jr., and G. E. Hall, by a deed recorded June 7, 1968. In order to consummate a deal with the Federal government, it was necessary for the Halls to purchase the parcels owned by Amaral, First Gray Line, and the City of San Diego. [1]
The parcel owned by Amaral was purchased by the Halls on November 6, 1969, for a consideration of $75,000. On March 16, 1970, the Halls also purchased the land owned by the City of San Diego for $350,000, and the land owned by First Gray Line for $250,000. The investment property at 201 West Broadway, and the adjoining parcels which were purchased by Oakley J. Hall, Jr., and G. E. Hall for a total consideration of $675,000, *240 were subsequently transferred to the United States of America in exchange for excess Federal land known as the Warren Housing property. The purchase agreement covering this tranfer was dated December 28, 1969. The Warren property was conveyed to Oakley J. Hall, Jr., and G. E. Hall by quitclaim deed dated February 27, 1970. Simultaneously, but under a purchase agreement dated November 19, 1969, the Warren property was sold by Oakley J. Hall, Jr., and G. E. Hall to Swan Constructors, Inc., for $2,300,000. The Halls paid a real estate commission in the amount of $200,000 to the several real estate brokers who had put the deal together. The parties have stipulated that for estate tax purposes the value of decedent's separate property interest in a diesel yacht named the "Caronia," as of September 24, 1967, was $275,000. ULTIMATE FINDINGS OF FACT (1) The fair market value of the 700,000 shares of San Diego Marine Construction Co. on September 24, 1967, exclusive of the investment real estate at 201 West Broadway, was $1,680,000. (2) The fair market value of the investment real estate located at 201 West Broadway, San Diego, Calif., and owned by Marine on September 24, 1967, was *241 $850,000. OPINION The sole issue in this case involves the determination of the fair market value of 700,000 shares of stock in San Diego Marine Construction Co. owned by decedent, Oakley J. Hall, on September 24, 1967, the date of his death. These shares represent all of the outstanding stock of Marine. By agreement, both parties addressed themselves to this valuation issue as follows. First, these shares of Marine were valued by each party exclusive of the investment real estate owned by Marine and located at 201 West Broadway, San Diego, Calif. Secondly, separate determinations were made of the value of this real estate. Finally each party added together the two separately computed values to arrive at his determination of the fair market value of the Marine stock. We have followed the approach taken by the parties in determining the total value of the stock in question. On its Federal estate tax return, petitioner reported the value of the 700,000 shares of Marine to be $2,185,000. Petitioner now claims that the value of the stock, exclusive of the investment real estate, was $1,216,000 and that the value of the real estate was $800,000. In the notice of deficiency respondent *242 determined the value of the 700,000 shares of Marine to be $3,133,000. In his answer to an amended petition and in support of his claim for an increased deficiency, respondent claims that the value of the stock, exclusive of the investment real estate, was $2,600,000 and that the value of the real estate was $1,100,000. Section 2001, I.R.C. 1954, [2] imposes an estate tax on the transfer of the taxable estate of a decedent, which, under section 2051, shall be determined by deducting from the value of the gross estate the exemption and deductions provided in Part IV. Sections 2031(a) and 2033 provide in general that the value of the gross estate of a decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, to the extent of decedent's interest therein. Value of the stock exclusive of the real estate.
The first question for resolution is the fair market value *243 at the date of decedent's death of his 700,000 shares of stock in Marine, exclusive of the investment real estate. Marine's stock is not listed on a stock exchange nor have there been any sales of the stock to assist in determining its fair market value. The long-standing and accepted definition of fair market value is contained in section 20.2031-1(b), Estate Tax Regs., which states, in pertinent part: The fair market value is the price at which the property would change hands between a willing buyer and a willing seller neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * * Estate of Maurice Gustave Heckscher,63 T.C. 485 (1975). Since the stock of Marine was not traded on the open market, we must first follow the dictates of section 2031(b), which provides: Valuation of Unlisted Stock and Securities.-- In the case of stock and securities of a corporation the value of which, by reason of their not being listed *244 on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange. In addition, section 20.2031-2(f), Estate Tax Regs., provides that in valuing stocks and bonds where selling prices or bid and asked prices are lacking, the fair market value is established by taking the following factors into consideration: In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: The good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and *245 the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * The evidence pertinent to this issue consisted primarily of the testimony and valuation reports of petitioner's expert, Thomas P. Morrissey (sometimes hereinafter Morrissey), and respondent's expert, Matthew J. Donohue (sometimes hereinafter Donohue). Both experts appear to agree that around the valuation date the prospects of the economy in general were favorable. Petitioner's expert, in his report, noted that shipyards, such as Marine, which engage primarily in ship repair work, tend to show somewhat erratic records. Additionally, respondent's expert concluded that the shipbuilding and repair industry is highly competitive and has a tendency to experience cycles of high and low levels of activity. The experts agreed that the industry as a whole had reached a peak of profitability in 1966-7 and that there would continue to be relatively high levels of activity within the industry as *246 a result of the continuing needs of the military, particularly the Navy, due to the conflict in Southeast Asia. Respondent's expert added the caveat that "the industry was faced by problems and uncertainties which led many to believe that 1968 and 1969 would not match very favorable operating results achieved by industry members in 1967." Because of the nature of the stock involved, both experts followed the guidelines enunciated in section 2031(b) and section 20.2031-2(f), Estate Tax Regs. Unfortunately the final opinions of these experts as to the fair market value of the stock of Marine on the vaulation date, exclusive of the investment real property, differed dramatically with petitioner's expert valuing the stock at $1,216,000, and respondent's expert at $2,600,000. While these experts considered similar factors the vast difference in their respective appraisals of approximately $1,400,000 resulted from the different application of these factors and the emphasis they placed on each of these separate factors. Both experts relied heavily on the capitalization of earnings of Marine to determine the value of its stock and in doing so considered the price-earnings ratios and other *247 factors relative to prices being paid for the stock of other corporations listed on stock exchanges which they considered were comparable to Marine. In fact, they chose and analyzed a number of the same corporations in establishing the multiples they applied to the earnings of Marine to determine value. Nevertheless, the large gap between the two experts necessitates a discussion of each appraisal. Petitioner's expert, Morrissey, in arriving at the fair market value of the stock of Marine, used three basic approaches: (1) capitalization of earnings; (2) capitalization of dividends; and (3) the application of a ratio based on the relationship of market price to book value. After Morrissey arrived at three separate valuation figures, he averaged these amounts together counting the capitalization of earnings approach three times and the other two approaches once. In establishing a valuation under the earnings approach, Morrissey readjusted the net income of Marine by estimating a salary for decedent at $50,000 per annum. He also estimated interest charges at a rate of 6 percent on the noninterest-bearing debt which Marine owed to decedent. These additional estimated expenses lowered *248 the net income of Marine to the following amounts: FYE
Adjusted Sept. 30,
net income
1962
$ (23,996)
1963
3,312
1964
78,166
1965
108,013
1966
425,494
1967
212,646
Morrissey next determined price-earnings multiples for companies which he considered comparable to Marine. He established yearly price-earnings ratios for each company by dividing the yearly earnings by the average price of the stock during that year. The following table of price-earnings ratios was constructed by Morrissey: EARNINGS PER SHARE AND PRICE:EARNINGS MULTIPLES OF FIVE COMPARABLE COMPANIES 1962-67
Earnings per share
Company
Listed
1962
1963
1964
1965
1966
$
$
$
$
$
Average Ship Building Company (The)
NYSE
(0.48)
0.29 .35 1.17
1.63
Campbell Machine, Inc. ASE
0.34
0.44 0.59 0.98
2.29
Levingston Shipbuilding Company
OTC
1.53
(1.21)
0.44 3.13
5.85
Maryland Shipuilding & Drydock Company
OTC
0.97
(2.66)
3.07 4.03
4.48
Todd Shipyards Corporation
ASE
1.95
1.64 (0.01)
5.22
6.24
Average
Price
Nine Months
Average
Ended
Price
Latest 12 Months
September 30,
September,
Company
Earnings
1967
1967
$
$
$
American Ship Building
Company (The)
1.64 - 6/30/67
22.12
29.81
Campbell Machine, Inc. 2.22 - 6/30/67
21.00
19.88
Levingston
Shipbuilding Company
4.90 - 6/30/67
35.00
34.75
Maryland Shipbuilding &
Drydock Company
4.48 - 12/31/66
29.38
32.50
Todd Shipyards
Corporation
6.24 - 3/31/67
37.94
46.38
*249 Price:Earnings Multiples Based on Average Annual
Market Prices and Year-End Earnings Per Share
1962
1963
1964
1965
1966
Times
American Ship Building
Company (The)
Deficit
19.2(a)
18.2(a)
9.0
8.0
Campbell Machine, Inc.
9.2
6.0
5.3
4.8
4.0
Levingston Shipbuilding
Company
4.6
Deficit
14.8(a)
5.0
4.4
Maryland Shipbuilding &
Drydock Company
18.3(a)
Deficit
5.7
5.8
5.2
Todd Shipyards
Corporation
11.7
14.9(a)
Deficit
5.7
6.1
Average, excluding
atypical ratios
8.5
6.0
5.5
6.1
5.5
Average excluding atypical
Ratios and excluding American Ship
Building and Todd
6.9
6.0
5.5
5.2
4.5
Price:Earnings Multiples
Based on Latest
12 Months Earnings and
Average Price
Nine Months
Average
Five-Year
Three-Year
Ended
Price
Average
Average
September 30,
September,
1962-66
1964-66
1967
1967
Times
American Ship Building
Company (The)
13.5(a)
18.2(a)
Campbell Machine, Inc.
9.5
9.0
Levingston Shipbuilding
Company
7.1
7.1
Maryland Shipbuilding &
Drydock Company
6.6
7.3
Todd Shipyards
Corporation
6.1
7.4
Average, excluding
atypical ratios
6.3
5.7
7.3
7.7
Average excluding atypical
ratios and
excluding American Ship
Building and Todd
5.6
5.1
7.7
7.8
*250 Notes: (a)Excluded from averages as atypical. Parentheses indicate red figures. Source: Appendix C. Computations by Standard Research Consultants. As stated in a footnote in the table, Morrissey excluded certain ratios which he considered atypical and he also eliminated American Ship Building Company and Todd Shipyards Corp. from consideration claiming that these firms were not comparable. Petitioner's expert was left with three comparables whose average price-earnings ratio for 1964, 1965, and 1966 were 5.5, 5.2, and 4.5, respectively. The overall average for this 3-year period was 5.1. Morrissey concluded that based on all relevant factors, the appropriate multiple to be used in capitalizing the historical earnings of Marine should be 5.0. He also determined that the earnings for the latest 3 years and for the latest year were the most significant in view of the upward trend of earnings. Consequently, when the 5.0 multiple was applied to the latest 3-year average adjusted net income and latest year net income of Marine and the two resulting figues were then averaged together, Morrissey obtained the following fair market value based on capitalization of earnings: Latest 3-year (1965-67)
average earnings of
$248,717 X 5
= $1,243,585
Latest fiscal year (1967)
earnings of
$212,646 X 5
= $1,063,230
Indicated fair market
value on earnings basis
(average)
= $1,153,407
*251 Under his dividend approach to fair market value, Morrissey created the following table of dividend yields and dividend payout ratios of his five comparable companies: DIVIDEND YIELDS AND DIVIDEND PAYOUT RATIOS FIVE COMPARABLE COMPANIES 1962-66 Company
1962
1963
1964
1965
1966
%
%
%
%
%
Dividend Yields
American Shipbuilding Company (The)
Nil
Nil
2.0
1.7
4.2
Campbell Machine, Inc.
3.5
5.7
6.1
4.1
3.5
Levingston Shipbuilding Company
Nil
2.0
Nil
1.6
2.9
Maryland Shipbuilding & Drydock Company
7.0
3.9
3.4
4.0
4.3
Todd Shipyards Corporation
6.1
5.7
5.2
4.7
3.7
Average(a)
5.5
4.3
4.2
3.2
3.7
Dividend Payout Ratios
American Shipbuilding Company (The)
Nil
Nil
35.7
15.0
33.7
Campbell Machine, Inc.
32.4
34.1
32.2
19.4
14.2
Levingston Shipbuilding Company
Nil
(d)
Nil
8.0
12.8
Maryland Shipbuilding & Drydock Company
128.9(c)
(d)
19.5
23.6
22.3
Todd Shipyards Corporation
71.8(c)
85.4(c)
(d)
26.8
22.4
Average(b)
32.4
34.1
29.1
18.6
21.1
San Diego Marine Construction Co.
Nil
Nil
Nil
Nil
Nil
Notes: (a) Of companies paying dividends. (b) Excluding atypical *252 ratios. (c) Considered as atypical. (d) Deficit earnings. Based on these computations, dividend yield averaged between a high of 5.5 percent in 1962 to a low of 3.2 percent in 1965. Average dividend payout ratio, excluding those which Morrissey deemed atypical, ranged from a high of 34.1 percent in 1963 to 18.6 percent in 1965. Although Marine did not pay any dividends during these years, Morrissey made the assumption that Marine had a dividend paying capacity of 25 percent on the average earnings for the last 3 years (1965-67) of $248,717, or $62,179. He also assumed a dividend yield of 5 percent thereby obtaining a fair market value under the dividend approach of $1,243,580. Finally, in considering the question of fair market value as related to the book value of a company, Morrissey concluded that there is generally a relationship between the percent earned on common equity and the ratio of market price to book value, i.e., the more a company earns on its common equity, the higher its stock tends to sell in relationship to book value. Following this theory, petitioner's expert devised the following chart for the comparable companies and Marine: RELATIONSHIP OF PERCENT EARNED *253 ON AVERAGE COMMON STOCK EQUITY AND RATIO OF MARKET PRICE TO BOOK VALUE COMPARABLE COMPANIES 1962-67
Five-Year (1962-66)
Three-Year (1964-66)
Averages
Averages
Percent
Percent
Earned on
Earned on
Average
Ratio of
Average
Ratio of
Common
Market
Common
Market
Stock
Price to
Stock
Price to Company
Equity
Book Value
Equity
Book Value
%
%
%
%
Campbell Machine, Inc.
26.3
125.6
32.7
130.0
Levingston Shipbuilding Company
9.8
58.7
15.6
74.7
American Ship Building Company (The)
5.7
81.9
10.1
93.6
Maryland Shipbuilding & Drydock Company
4.7
48.2
9.3
51.5
Todd Shipyards Corporation
4.7
44.9
5.9
48.5
San Diego Marine Construction Co.
4.0
6.9
Latest Available 1967 Data
Related to Average
Market Price Nine Months
Through September, 1967
Percent
Earned on
Average
Ratio of
Common
Market
Stock
Price to
Company
Equity
Book Value
%
%
Campbell Machine, Inc.
48.1
365.9
Levingston Shipbuilding Company
19.6
131.5
American Ship Building Company (The
13.7
177.2
Maryland Shipbuilding & Drydock Company
9.8
64.1
Todd Shipyards Corporation
9.4
54.9
San Diego Marine Construction Co.
6.3
*254 Sources: Appendix C, Table No. 6, Exhibit No. 8. Computations by Standard Research Consultants. Considering Marine's earnings rate in comparison to the alleged trends for the comparable companies, Morrissey determined a ratio of market value to book value for Marine of 40 percent would be appropriate in determining the price at which the stock would sell if it were freely traded. By applying the 40 percent to Marine's book value at September 30, 1967, of $3,442,000, petitioner's expert arrived at a fair market value of $1,376,800. It was Morrissey's position that although the stock in question constituted 100 percent of the outstanding stock of Marine and carried with it the authority to liquidate the entire corporation, this factor should not be controlling because there was no indication of an intention to liquidate and a substantial amount of the company's fixed assets investment was in leasehold improvements which could not be liquidated. After arriving at the three separate fair market value figures, Morrissey averaged them together assigning three times the weight to the value obtained under the earnings approach. The following table represents Morrissey's final calculations *255 of the fair market value of the Marine stock: FAIR MARKET VALUE OF CAPITAL STOCK OF SAN DIEGO MARINE CONSTRUCTION CO. SEPTEMBER 24, 1967 Indicated Valuation Approach
Value
Weight
Total
$
(Times)
$
Earnings based on:
Three-year (1965-67) average
1,243,585
Fiscal 1967
1,063,230
Average
1,153,407
3
3,460,221
Dividends
1,243,580
1
1,243,580
Book value
1,376,800
1
1,376,800
Total
5
6,080,601
Indicated fair market value ($1,216,120 rounded)
1,216,000
Respondent's expert, Donohue, used two approaches in reaching his determination of the fair market value of the Marine stock: (1) Capitalization of earnings, and (2) what could possibly be termed capitalization of cash flow. Donohue first created a chart which purportedly showed for a 10-year period revenues, adjusted earnings, depreciation, and cash flow of Marine. In determining the adjusted earnings of Marine, Donohue did not further decrease this amount by either an estimated salary for decedent or estimated interest on decedent's loan to Marine. Cash flow as defined by Donohue was the addition of depreciation deductions to earnings. Donohue's table is *256 as follows: Summary of Revenue, Earnings and Cash Flow 9/30/58 - 9/30/67 Fiscal
Earnings
Cash Year
Revenue
(Adjusted)
Depreciation
Flow
000
1967
$6,174
$248
$214
$462
1966
6,157
462
170
632
1965
4,031
144
146
290
1964
2,888
117
138
255
1963
3,691
45
272
317
1962
2,947
65
225
290
1961
2,328
80
69
149
1960
2,108
93
62
155
1959
1,608
42
60
102
1958
2,079
71
56
127
Five-year average
203
188
391
Ten-year average
137
141
278
Next, respondent's expert analyzed other companies in order to develop multiples. For comparison purposes, he chose six companies whose stocks are publicly traded: (1) American Ship Building Co. (2) Campbell Machine, Inc. (3) Levingston Shipbuilding Co.
(4) Maryland Shipbuilding and Drydock Co. (5) Todd Shipyards Corp.
(6) St. Louis Shipbuilding-Federal Barge, Inc. Donohue concluded that of these six companies, American Ship Building Co. and Campbell Machine, Inc., were not proper comparables. Consequently, he based his analysis on the other four. [3]
*257 To establish a valuation under the ratio of price to earnings and cash flow approach, Donohue also computed price-earnings and price-cash flow multiples for the companies which he considered comparable with Marine. Donohue developed his price-earnings and price-cash flow ratios by dividing the selling price of the stock of each corporation at date of death over a set number of years. In doing so Donohue developed the following table which he included in and referred to in his appraisal report: Comparative Corporations to San Diego Marine Construction Co. In re: Estate of Oakley J. Hall - Valuation Date: September 24, 1967 -Ratios - Market Price/to -
Net
Latest
10-year
5-year
tangible
Latest
10-year
5-year
year
average
average
asset
year
average
average
cash
cash
cash
value
earnings
earnings
earnings
flow
flow
flow
American
Shipbuilding Co.
247.62
18.64
52.24
30.23
10.78
19.55
14.38
Campbell Machine Inc.
359.27
9.01
33.98
22.25
8.38
[1]/
19.71
Levingston
Shipbuilding Co.
128.71
6.99
22.86
13.43
4.87
10.72
7.97
Maryland
Shipbuilding
72.58
7.43
11.47
16.28
5.62
7.09
8.71
& Drydock Co.
St. Louis
Shipbuilding -
160.66
6.64
[1]/
13.15
4.48
[1]/
7.45
Federal Barge, Inc.
Todd Shipyards Corp.
68.37
7.57
24.46
15.69
5.17
11.61
8.61
Total
1,037.21
56.28
145.01
111.03
39.30
48.97
66.83
Averages -
Arithmetic
172.87
9.38
29.00
18.51
6.55
12.24
11.14
Median
144.69
7.50
24.46
15.99
5.40
11.17
8.66
*258 -Ratios - Market Price/to -
Dividend yield
Latest
10-year
5-year
year
average
average
dividends
dividends
dividends
American Shipbuilding Co.
2.0
0.7
1.1
Campbell Machine Inc.
1.6
1/
0.9
Levingston Shipbuilding Co.
3.6
1.4
2.1
Maryland Shipbuilding
3.1
4.3
3.0
& Drydock Co.
St. Louis Shipbuilding -
2.5
1/
1.2
Federal Barge, Inc.
Todd Shipyards Corp.
3.0
3.1
3.0
Total
15.8
9.5
11.3
Averages - Arithmetic
2.6
2.4
1.9
Median
2.8
2.3
1.7
Donohue believed that the most significant tests of value would come from 5 years' average production of earnings. After eliminating American Shipbuilding and Campbell Machine, Inc., Donohue found he had price-earnings ratios for the four other companies which ranged between 13 to 16. He computed Marine's latest 5-year average income as $203,000 and when he applied the four price-earnings ratios to this figure he obtained values which ranged between $2,639,000 to $3,248,000. Donohue also used another method of valuation which could be characterized as capitalization of cash flow. Cash flow, *259 as used by Donohue, was the earnings plus depreciation deductions. First, respondent's expert established the cash flow for Marine and the other six companies for each year from 1958 through 1967. He then established price-cash flow ratios for the six comparative companies by dividing their respective market prices at the date of death by the cash flow of each company for the latest year, for a 10-year period and for a 5-year period. The following is the result of these calculations: Latest
10-Year
5-Year
Year
Average
Average
Cash Flow
Cash Flow
Cash Flow
American Shipbuilding Co.
10.78
19.55
14.38
Campbell Machine Inc.
8.38
[1]/
19.71
Levingston Shipbuilding Co.
4.87
10.72
7.97
Maryland Shipbuilding &
Drydock Co.
5.62
7.09
8.71
St. Louis Shipbuilding-
Federal Barge, Inc.
4.48
[1]/
7.45
Todd Shipyards Corp.
5.17
11.61
8.61
Total
39.30
48.97
66.83
Averages -
Arithmetic
6.55
12.24
11.14
Median
5.40
11.17
8.66
Donohue again excluded American and Campbell and chose the 5-year average cash flow as most significant. He computed Marine's *260 5-year average cash flow as $391,000 and applied to this figure price-cash flow ratios between 7-1/2 and 8-1/2 thereby obtaining values which ranged between $2,933,000 and $3,324,000. Finally, respondent's expert listed the following factors which were instrumental in his final determination of the value of the Marine stock: (1) The interest valued was a controlling interest; (2) The shipbuilding industry is highly competitive, thereby attaching a higher risk to investment; (3) The general condition of the industry was good but a down-turn was predicted; (4) Marine's earnings peaked in 1966 and showed a down-turn in 1967; (5) Marine's net tangible asset value exclusive of investment real estate was $3.1 million; (6)Long-term debt was relatively small; (7) Executive salaries were understated; and (8) Marine compared favorably with other industry members. Donohue concluded that the fair market value of the stock on the valuation date was $2,600,000. We recognize that the valuation process is not an exact science. By placing this case before us, these parties are asking us to establish a true fair market value for the property on the valuation date. As we have stated *261 previously, this difficult task could have been better resolved through a discussion and bargaining process involving the acknowledged experts of both the petitioner and respondent whom we believe should be better equipped to reach a proper result. See Estate of Maurice Gustave Heckscher,supra.Nonetheless, since this unwelcomed onus has been placed upon this Court, we have, in the exercise of our "Solomon-like wisdom," Morris T. Messing,48 T.C. 502 (1967), arrived at our determination of fair market value, as reflected in our ultimate finding of fact, by weighing all of the facts and circumstances contained in the entire record. Since Marine was an operating company, both experts accorded primary significance to Marine's earning capacity in valuing its stock. We agree with this approach in this case but since the two experts reached such diverse results with the same approach it is obvious that we, as well as knowledgable investors, should analyze the variables in the expert's approaches and make our own determination as to how best to use the various factual elements that enter into the computation under the existing circumstances. We must *262 also decide what other factors should be considered, and the weight to be given them, in our search for a realistic, though hypothetical, fair market value. It appears from a comparison of the two approaches that the single factor which causes the largest divergence in the experts' results is the price to be used in determining the price-earnings ratio of the comparable companies. Donohue used the stock exchange price on the valuation date and applied it to the average earnings over the latest 5 years of the comparable companies to arrive at a multiple of 13 to 16 to be applied to the average of the latest 5 years' earnings of Marine. Morrissey, on the other hand, determined the average price of the comparable's stock for each year taken into consideration and applied those prices to the earnings of the comparables for each of those years to develop his price-earnings ratios. He then totaled these multiples and divided the total by the number of years considered to arrive at the price-earnings ratio he determined for each of the comparables. This reflected multiples of slightly above or below 5 for the various comparables and he decided that a multiple of 5 should be applied to the *263 average of Marine's latest 3 years' earnings, and its latest year's earnings, to determine fair market value on the earnings approach. We prefer Morrissey's method of arriving at the multiple to be used in determining the value of this stock. In times of wide speculation and resulting fluctuations in the stock market we are extremely doubtful that the price at which a stock is traded on the stock exchange on any particular day is a true reflection of what an investor would pay for the stock if he was looking primarily to the historical earnings of the corporation to determine a fair price. We believe such an investor would give more weight to price-earnings ratio of comparable stocks during each of the years under consideration in determining a multiple that he can apply to the historical earnings of a corporation whose stock he is buying to determine the price he would pay for that stock. However, we cannot ignore entirely the multiples arrived at by Donohue. We think they are obviously too high for use with respect to a corporation engaged in a very competitive, high-risk, and volatile business. The greater the risk, the shorter the time an investor would be willing to count *264 on to recover his investment out of a corporation's earnings, and the smaller the multiples he would use. We conclude that Donohue's multiples are too high despite the fact that he claims support for the value produced by their uses in his cash-flow analysis. We accept the fact that a cash-flow analysis may be a useful supplementary tool to be used by an appraiser or investor to determine whether there are factors in a corporation's financial condition not revealed by an analysis of earnings that would make him hesitate to accept the indicated value, but we do not believe the cash-flow analysis used by Donohue would be used per se by investors to determine value. We find ample support for this conclusion in Exh. 48 "Cash Flow" Analysis and the Funds Statement, by Perry Mason, introduced into evidence by petitioner but relied on by both parties on brief. Nevertheless, giving due weight to Donohue's appraisal and to other factors which we believe should be taken into consideration, we believe the multiple of 5 developed by Morrissey is too low. In addition to the comparable companies and their respective price-earnings ratios, we believe the following factors would also be critical *265 in the development of a proper multiple if the fair market value of Marine's stock is to be stated in terms of price-earnings ratios: (1) The interest being valued is a 100-percent interest. This should add to the value of decedent's stock because of the unencumbered control it gives for determining what will be done with the business. (2) The lease from the Port Authority was one of the most important assets of Marine and the existing lease was due to expire on January 31, 1969. There was no assurance at the time of decedent's death that this lease would be renewed; and it was recognized that, if renewed, Marine would be required to spend a considerable sum to upgrade the improvements on the property; (3) At the valuation date, Marine was experiencing a strike, which began in June 1967 and ended after decedent's death; (4) Decedent appears to have been the guiding genius of Marine and he apparently kept such tight reins on the business that neither of his sons could develop much interest in the business; (5) Marine's operation was relatively small in comparison with other companies in the industry and its facilities were rather limited; (6) Marine's adjusted book value *266 at September 30, 1967, was $3,442,000. We have concluded that based on all the available evidence a hypothetical buyer of decedent's stock in Marine at the time of decedent's death would be willing to pay 7 times the earning capacity of Marine. There is also a difference in the experts' opinions of the earning capacity of Marine, but the difference is not so great as to cause us much concern. By taking the average of the latest 5 years of Marine's earnings, with no adjustments for salaries or interest, Donohue arrived at a figure of $203,000 as Marine's earning power. Strangely enough, Morrissey arrived at the higher figure of $248,000 as Marine's earning power despite adjusting its reported income downward for salaries and interest. This was because he concluded that the latest 9 months' earnings and the average of the latest 3 years' earnings would better reflect Marine's potential earnings in the future. We would take a middle position on this and use Marine's earnings over the latest 4 years as a guide to prognosticate the future earnings. A turnaround in Marine's profitability appears to have occurred in 1964 and despite the falloff in Marine's profits in 1967 when compared *267 to 1966, the prospects of continued good business activity in the industry seem well founded. Giving special emphasis to its latest 4 years' earnings, but without simply relying on the mathematical average of those years, we conclude that a reasonable earning capacity for Marine to be used in arriving at a valuation figure through the capitalization of earnings would be $240,000. As stated by the Court of Claims in Central Trust Company v. United States,305 F. 2d 393, 404: "Prior earnings records usually are the most reliable guide as to the future expectancy, but resort to arbitrary five-or-ten-year averages without regard to current trends or future prospects will not produce a realistic valuation. * * *" By applying our multiple of 7 to this earning capacity we arrive at a figure of $1,680,000 which, in our best judgment, was the fair market value of decedent's stock of Marine at the time of his death. In reaching our conclusion we have given little weight to petitioner's theory of capitalizing assumed dividend paying capacity because we do not believe it is relevant here. Marine paid no dividends until it became a subchapter S corporation and then it *268 distributed all of its earnings. We have not overlooked the fact that Marine had a book value of $3,442,000 at September 30, 1967, but we deem it quite unlikely that such a value could have been realized if the company had been liquidated; furthermore, there was no indication in the evidence that there was any intent to liquidate the company at the time of decedent's death. Nor have we ignored completely the fact that Marine's assets were sold to Campbell for approximately $4,600,000 in 1972. However, this sale occurred about 5 years after decedent's death after Marine had obtained a renewal lease with options to extend it to 50 years, and after Marine had spent about $1,800,000 for improvements to the property. Furthermore, not much cash was received on the sale and the sale took place because of Campbell's special need of the facilities at that time, so we have given little weight to this factor. Value of the investment real estate. Our next task is to determine the fair market value at the date of decedent's death of the real property owned by Marine located at 201-251 West Broadway in San Diego, Calif.
Petitioner offered as evidence in support of its position that the value *269 of the property was $800,000 the appraisal report and testimony of its expert, Emmett J. McKanna. McKanna had been commissioned by the General Services Administration in 1968 to render an opinion on the fair market value of eleven parcels of real estate, including subject property, in connection with a study of possible sites for a Federal building project. McKanna's appraisal report and opinion reflected a value as of September 15, 1968, approximately 1 year after decedent's death. McKanna employed the following three generally accepted approaches in valuing real property: (1) The cost approach; (2) The income approach, and (3) The comparative market approach. Using these approaches he arrived at a fair market value for the subject real estate of $850,000 as of September 15, 1968. McKanna's appraisal report appears to be a well-documented study of the subject property. McKanna defined the highest and best use of land concept, which is an important ingredient in land valuations, as the most profitable, likely, and legal use to which the property is adapted and for which there is demand. In his report McKanna stated; Highest and best use of the property is considered *270 to be a combination commercial and retail usage in line with the exising [sic] usages of the building. This estimate is made in light of the existing improvements and is in keeping with other usages of property in the neighborhood. We will forego a detailed analysis of McKanna's methods of analysis because respondent's primary attack on McKanna's appraisal was disagreement with his conclusion as to the highest and best use of the property. Furthermore, McKanna's evidence was the only evidence offered which we would consider to be an expert's opinion of value. Respondent's only evidence of value offered at the trial was the testimony of Harold Pierce, an estate and gift tax agent for the Internal Revenue Service who had prepared the report on which the Commissioner determined the fair market value of this property in his notice of deficiency. We do not question Pierce's qualifications as an expert real estate appraiser, but his testimony was limited to an explanation of how he arrived at the valuation figure used in his report, which was a mathematical calculation from what we consider to be unjustified assumptions based on hindsight. Pierce's report was prepared in late *271 1969 or 1970. He testified that he did not appraise this real estate "in the sense of making a formal appraisal report * * *." Pierce concluded that the property had a fair market value as of the date of decedent's death of $1,100,000. While respondent argues that Pierce concluded that the highest and best use of this property was for an office building, we believe it is clear from Pierce's testimony and his method of determining the value of this property that he concluded its highest and best use was for the Federal courthouse and office building that is presently being constructed on the property. By the time Pierce made his report the site for the Federal building had become fixed and Pierce apparently thought the project had been approved prior to decedent's death. The evidence is to the contrary; the project itself was not approved by Congress until May of 1968 and the site was not actually settled until sometime after that. There was no assurance on the valuation date that subject property would be used for a Federal office building and a valuation based on the assumption that it would be used for that purpose was neither justified nor well founded. Pierce's assumption also *272 led him to use a method for determining the value of this property which is questionable. While Pierce testified that he took into consideration sales of comparable properties he offered no evidence about the comparables he used. It appears that Pierce relied primarily on the transactions by which the Halls acquired the remainder of the property needed by the Federal government, exchanged it and subject property for the Warren tract which was owned by the government, and then sold the Warren tract to Swan Constructors, Inc., in November of 1969. The Halls acquired the remainder of the land needed by the government for a total of $675,000. After the exchange they sold the Warren tract for $2,300,000. Pierce subtracted the $675,000 and a $200,000 real estate commission paid by the Halls from the $2,300,000 sales price of the Warren tract and attributed the balance of $1,425,000 to the Broadway property originally owned by Marine. He then discounted that figure by about 6 percent for each of the years between the valuation date and the date of the sale to arrive at his value of $1,100,000 for the Broadway property as of the date of decedent's death. This is not an acceptable method *273 for determining the fair market value of subject property as of the date of decedent's death and we can give it no weight. We are thus left with McKanna's appraisal as the only reliable evidence of fair market value. His appraisal approach was sound and in accord with generally accepted appraisal methods and we have no reason to question the validity of the comparables he used. We accept his appraisal figure of $850,000 as the fair market value of the property as of September 24, 1967. Petitioner would have us discount this figure by 6 percent for the claimed increase in value of the property between the valuation date and McKanna's appraisal date. McKanna did not testify that a 6-percent discount should be applied to his valuation figure and we have no competent evidence that would justify a 6-percent discount. Furthermore, we believe some consideration should have been given to the possibility that the property might be used for a Federal or other office building location. The property was well located in downtown San Diego and the building on the property was a one-story structure about 50 years old. We believe there was a likelihood that in a growing city like San Diego this *274 property would be converted to a more profitable use than the commercial and retail use for which it was being used in September of 1967. Consideration of this factor would tend to raise the value even at the date of decedent's death. So we will not apply a discount to McKanna's appraised value but will accept it as the fair market value of subject property on the valuation date. Adding the $850,000 value of the real estate to the $1,680,000 we have found as the value of the stock exclusive of the real estate, we conclude that the total value of decedent's stock in Marine at the date of his death was $2,530,000. Decision will be entered under Rule 155.
Footnotes
1. Acquired from stockholder - Principally land and buildings.↩
1. /↩ Respondent failed to exclude this item and as a result, computed the net income for FYE 9/30/62 as $64,566.
1. Some of this land was encumbered by leases but they were apparently eliminated prior to the ultimate exchange between decedent's heirs and the Federal government.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
3. Parenthetically, we note that petitioner's expert studied five of the six corporations examined by respondent's expert, the only exception being St. Louis Shipbuilding - Federal Barge, Inc.; however, petitioner's expert excluded American Shipbuilding and Todd Shipyards Corp. as comparables.↩
1. /↩ Information for 10-year averages not available.
1. /↩ Information for 10-year averages not available.